911 A.2d 841

**LABORATORY CORPORATION OF AMERICA, et al.**

v.

**Karen HOOD, et al.**

**Misc. No. 1, Sept. Term, 2006.**

Court of Appeals of Maryland.

Dec. 1, 2006.

Bruce R. Parker (Mitchell Y. Mirviss, William Piermattei, David S. Gray, Venable LLP, Baltimore, on brief), for appellants.

E. Dale Adkins, III (Sarah E. Brannon, Emily C. Malarkey, Salsbury, Clements, Bekman, Marder & Adkins, L.L.C., Baltimore, on brief), for appellees.

George S. Tolley, III, Dugan, Babij & Tolley, LLC, Timonium, amicus curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA, and GREENE, JJ.

WILNER, J.

We have before us three questions of law certified by the United States District Court for the District of Maryland pursuant to the Maryland Uniform Certification of Questions of Law Act (Maryland Code, §§ 12–601 through 12–613 of the Cts. & Jud. Proc. Article). The questions arise from an action by Karen and Scott Hood, Maryland residents, against two North Carolina corporations—Laboratory Corporation of America and Laboratory Corporation of America Holdings, which we shall refer to collectively as LabCorp.

The action is one that is often, but misleadingly, denominated as "wrongful birth." The Hoods complain that the defendants were negligent in misreading a chromatograph of the DNA from an amniotic fluid specimen extracted from Ms. Hood and erroneously reporting that the fetus was not likely to be affected by cystic fibrosis (CF). Relying on the erroneous report, Ms. Hood elected to continue with the pregnancy, and that resulted in the birth of their son, Luke, who *does*

have CF. The Hoods now seek to recover damages for the cost of raising and caring for Luke.

The questions certified to us are:

1. In a case where a medical laboratory receives a specimen from a Maryland physician and erroneously interprets the specimen in another State, causing injury in Maryland to Maryland residents, should this court follow the "standard of care" exception in the RESTATEMENT (FIRST) OF CONFLICTS OF LAW § 380(2) and apply the substantive law of the State where the erroneous interpretation took place?

2. Does denying Maryland residents the right to bring a wrongful birth action by applying North Carolina law violate the public policy of the State of Maryland?

3. Where a laboratory analyzes a mother's amniocentesis specimen and the results are provided to the mother's physician, but relied upon by both parents, does the laboratory have a sufficient relationship with the father that gives rise to a duty of care?

The problem underlying the first two certified questions, and to some extent the third, is that, while Maryland recognizes an action of this kind by the parents, North Carolina apparently does not, and the District Court, which must apply Maryland law, including the Maryland law on conflicts of law, desires to know whether, in the situation at hand and if the action were filed in a Maryland court, we would apply the substantive law of Maryland, where the injury occurred, or of North Carolina, where the negligent acts or omissions took place.

We cannot answer the third question precisely as presented, for to do so might require us to assume certain subsidiary facts that are for the District Court to resolve, but we shall respond in the most helpful way that we can. The basic facts underlying these questions are set forth by the District Court in its Certification Order and in its Memorandum responding to cross motions for summary judgment.

The Hoods are Maryland residents. Their first child, Zachary, was born in 1997 and was diagnosed with CF when he

was two. In the present state of medical science, persons with CF are doomed to suffer from lung, gastrointestinal, pancreatic, heart, and other organ diseases, and rarely live beyond their mid–30s. In order to develop CF, a child must receive a particular gene mutation from both parents. After Zachary was diagnosed, the Hoods learned that they both carry the recessive delta F508 gene mutation that causes one of the most severe forms of CF. Because they are both carriers of that mutation, each of Karen's pregnancies carries a 25% risk of the child having CF.

In 1999, Ms. Hood became pregnant again, and she and her husband were referred by Ms. Hood's obstetrician to a genetic counselor. Genetic testing performed on the fetus revealed that it had CF, whereupon Ms. Hood terminated the pregnancy. In August, 2001, she became pregnant the third time and again decided to have the fetus tested. The Hoods had already made the decision to terminate the pregnancy if the fetus tested positive for CF. On November 27, 2001, Ms. Hood had an amniocentesis performed, in Maryland, by her obstetrician, Thomas Pinkert.

LabCorp operates a nationwide network of 35 primary testing locations and more than 1,100 patient service centers, eight of which are located in Maryland. Although it receives specimens from physicians and from its various patient service centers throughout the country, LabCorp performs all of its genetic testing on amniotic fluid at its Center for Molecular Biology and Pathology in North Carolina. The company markets genetic testing services to couples such as the Hoods. Before the specimen taken from Ms. Hood was sent to LabCorp for testing, the Hoods' genetic counselor, Amy Kimball, who worked in Dr. Pinkert's office in Maryland, informed LabCorp that both Karen and Scott Hood carried the CF gene. The sample was sent to the LabCorp facility in North Carolina, where the DNA in it was subjected to a chromatograph that was analyzed by two LabCorp employees, Marcia Eisenberg and Nicholas Brown.

In conformance with the analysis done by Eisenberg and Brown, LabCorp reported to Dr. Pinkert that, although both parents were carriers of the delta F508 mutation, the amniotic fluid was negative for 31 common CF genetic mutations, and "[t]his fetus is not expected to be a carrier of cystic fibrosis or be affected by cystic fibrosis." Pinkert sent the report to the Hoods. Based on the LabCorp report, the Hoods elected to continue the pregnancy, resulting in the birth of Luke on May 3, 2002. Three months later, the child was found to be positive for CF. In September, 2002, LabCorp issued a corrected report which noted that the original chromatograph did, indeed, demonstrate that the fetus was positive for the delta F508 mutation that causes CF—the box containing the word "del F508" was marked with an asterisk, indicating that the fetus had CF—and stated that Eisenberg and Brown had misread the chromatograph.

The District Court issued a partial ruling on the cross-motions for summary judgment. In that ruling, the court held that, under Maryland law, the Hoods' action was for negligence, not breach of contract, and that the Maryland law of negligence therefore applied. The court observed that, in diversity cases, such as the one at hand, it was obliged to apply Maryland's choice of law rules and determined that Maryland adheres to *lex loci delicti* principles for all tort claims, *i.e.*, we apply the law of the place where the tort or wrong was committed. It concluded that, under our application of those principles, the place where the last event required to give rise to the tort occurred determines the law that should apply, that in personal injury claims the last event required to give rise to the tort is the injury, and that the injury in this action occurred in Maryland, where Luke was born.

LabCorp asserted in the District Court that, even if *lex loci delicti* principles apply, the court should recognize the exception to those principles enunciated in RESTATEMENT (FIRST) OF CONFLICT OF LAWS, § 380(2). Section 380(2) states:

"Where by the law of the place of the wrong, the liability-creating character of the actor's conduct depends upon the

application of a standard of care, and such standard has been defined in particular situations by statute or judicial decision of the law of the place of the actor's conduct, such application of the standard will be made by the forum."

Labcorp's argument was that its potential liability flows from the issuance of the erroneous report by Eisenberg and Brown, that any breach of the standard of care therefore occurred in North Carolina, and that, under § 380(2), North Carolina law should dictate whether those employees breached a duty owed to the Hoods. Labcorp posited, and the court acknowledged, that the U.S. Court of Appeals for the Fourth Circuit had assumed that Maryland would recognize the § 380(2) exception in negligence cases. *See Farwell v. Un,* 902 F.2d 282 (4th Cir.1990). The District Court pointed out, however, that this Court had never determined whether that exception should apply, and that is what led it to certify the first question.

Whether Maryland or North Carolina law applies is critical to the Hoods' case. In *Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528 (1985), the North Carolina Supreme Court held that the parents of a child born with even severe birth defects did not suffer any legally cognizable injury, and thus the Hoods' action could not succeed under North Carolina law. In *Reed v. Campagnolo,* 332 Md. 226, 630 A.2d 1145 (1993), responding to a certified question from the U.S. District Court, we adopted a completely opposite point of view, noting that "[t]he *Azzolino* analysis does not recognize even the economic impact on the parents and, in that respect, is contrary to Maryland law." *Id.* at 238, 630 A.2d at 1151. That divergence forms the basis of the second certified question. If application of RESTATEMENT § 380(2) would ordinarily cause North Carolina law to be applicable in this case, would Maryland nonetheless refuse to apply that law on the ground that it would be contrary to Maryland public policy to deny a Maryland resident, suing in a Maryland court for a wrong committed in Maryland, a remedy recognized in this State.

Finally, for our purposes, LabCorp contended that, even if Maryland law were to apply, that law would provide a remedy only to Karen, not to her husband, Scott—that the decision whether to terminate the pregnancy was Karen's alone and that, in any event, a physician's duty runs only to his or her patient and the physician owes no cognizable duty to a patient's spouse. Uncertain whether our decision in *Dehn v. Edgecombe,* 384 Md. 606, 865 A.2d 603 (2005) would preclude a cause of action by Scott, the court certified the third question.

### *Standard of Care Exception in* RESTATEMENT *§ 380(2)*

Unlike most other States, which have abandoned the *lex loci delicti* approach espoused in §§ 378–390 of the RESTATEMENT (FIRST) OF CONFLICT OF LAWS in favor of the "significant contacts" test enunciated in §§ 6, 145, and 146 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS, Maryland continues to adhere generally to the *lex loci delicti* principle in tort cases. Under that approach, where the events giving rise to a tort action occur in more than one State, we apply the law of the State where the injury—the last event required to constitute the tort—occurred. *See Philip Morris v. Angeletti,* 358 Md. 689, 744–47, 752 A.2d 200, 230–32 (2000); *Hauch v. Connor,* 295 Md. 120, 123–25, 453 A.2d 1207, 1209–10 (1983); *White v. King,* 244 Md. 348, 352, 223 A.2d 763, 765 (1966).

In maintaining our allegiance to the *lex loci delicti* approach, we have continued to follow the principles stated in the RESTATEMENT (FIRST) OF CONFLICT OF LAWS. *See Philip Morris, supra,* 358 Md. at 745, n. 25, 752 A.2d at 231, n. 25, confirming the observation of the Court of Special Appeals in *Black v. Leatherwood,* 92 Md.App. 27, 41, 606 A.2d 295, 301, *cert. denied,* 327 Md. 626, 612 A.2d 257 (1992) that "[b]ecause Maryland is among the few states that continue to adhere to the traditional conflict of laws principle of *lex loci delicti,* the First Restatement of Conflict of Laws, while of merely historical interest elsewhere, continues to provide guidance for the determination of *lex loci delicti* questions in Maryland." Our articulation of the doctrine mirrors that of the initial version of

the RESTATEMENT, and we have often cited to that work as authority for our holdings.

Section 380 is part of the series of sections articulating the doctrine. Section 377 defines the "place of wrong" as the place where the last event necessary to make an actor liable for an alleged tort takes place, which in this case, as the District Court correctly determined, is Maryland. Section 378 declares that the law of the place of wrong determines whether a person has sustained a legal injury; § 379 makes that law determinative of whether a person is responsible for unintended harm; § 383 applies that law in determining causation; § 385 applies that law in determining whether contributory negligence precludes recovery in whole or in part; § 386 applies that law with respect to the "fellow servant" rule; § 387 applies it in determining vicarious liability; § 388 applies it to defenses; § 390 applies it to whether an action survives the death of the tortfeasor or the injured person.

In this mix is § 380, which deals with standard of care. Section 380(1) states the general rule that "where by the law of the place of wrong, the liability-creating character of the actor's conduct depends upon the application of a standard of care, the application of such standard will be made by the forum in accordance with its own rules of evidence, inference and judgment." In other words, the substantive standard of care to be applied is that of the place of wrong, but its application to the facts presented to the forum court is to be determined in accordance with the rules of evidence, inference, and judgment of the forum State. Section 380(2) carves out a limited exception to that rule. If, under the law of the place of wrong, the liability-creating character of the actor's conduct depends upon the application of a standard of care *"and such standard has been defined in particular situations by statute or judicial decision of the law of the place of the actor's conduct,* such application of the standard will be made by the forum." (Emphasis added).

These principles are clarified in two comments to § 380. Comment a., which explains the general principle in § 380(1), begins by recalling that, under the rule stated in § 379, the

liability-creating character of the actor's conduct is determined by the law of the place of wrong. The comment then notes the obvious proposition that, where the law of the place of wrong prescribes a standard of care by which the actor's conduct is to be judged, "the application of such standard to the facts in a particular case must necessarily be made by a fact-finding body at the forum in accordance with local procedure." Thus:

"[I]f the general standard of the conduct of a reasonable man has not been defined by statute or judicial decision of the [S]tate of acting, the question whether the actor's conduct is negligent is decided by the forum in accordance with its own rules of evidence, inference and judgment. Negligence is lack of due care under the circumstances; and what care should be given under certain circumstances is a question for adjudication in each particular case. The tribunal at the forum will decide this question and will not be influenced by the fact that another court, even the court of the [S]tate where a defendant acted, would have come to a different conclusion on the facts proved."

Comment b., captioned "Negligence per se and breach of statutory duty," explains the exception in § 380(2):

"If, by the law of the place of the actor's conduct, *the general standard of due care has been defined by judicial decision so as to pronounce certain conduct, as specific acts or omissions, to be or not to be negligent,* the forum will apply the standard in the same manner although under the local law the case would have been for the judgment of the jury on the facts in question. So too, if by statute or other legislative enactment of the [S]tate of the actor's conduct the general standard of due care has been narrowed in a particular situation, the forum will make a similar application of the standard of care although under the local law the case would have been one for the jury because no such statute there existed."

(Emphasis added).

As explicated in these comments, for a State that follows the *lex loci delicti* rule, both the general provision in

§ 380(1) and the limited exception in § 380(2) make perfectly good sense. If the standard of care under the law of the place of acting is simply that of reasonableness, either general reasonableness or reasonableness for a person in the defendant's position, and there is no more particular guidance under that law with respect to the application of that standard to the facts at hand, the forum court would have to determine from the facts presented to it and in accordance with its own procedures whether that standard has been met. If, on the other hand, the State where the acts were committed has determined, either by judicial decision or statute, that a person who commits those acts either has, or has not, breached the applicable standard of care and therefore either is, or is not, negligent as a matter of law, the forum court must act in conformance with that judicial decision or statute, even if its own law, or the law of the place of wrong, is different.[1]

LabCorp suggests an unfairness to that approach, but we perceive no unfairness. A person who commits a tort in another State should, as a general rule, be liable in accordance with the law of that State—where the harm was done. The narrow exception, that requires looking to the law of the State where the conduct was committed, applies only where the existence and nature of the duty or its breach depends on a standard of care and that State, by statute or judicial ruling, has defined the particular conduct as either complying or not complying with the applicable standard of care. The exception gives deference to the notion that, where the law of the place of conduct is so clear and particular, persons in that

---

1. In this case, because Maryland is both the place of wrong and the locus of the forum court, there are only two options—Maryland law or North Carolina law. In other settings, the forum court could be in a third State, in which event, assuming a *lex loci delicti* approach and but for § 380, the law of three States could be put in play. In that situation, the forum court would generally apply Maryland law (law of the place of wrong) except that, for purposes of *applying* the applicable standard of care, would look to its own law unless North Carolina, by statute or judicial decision, had declared the conduct at issue to constitute or not constitute a breach, in which event it would apply that aspect of North Carolina law.

place have a right to rely on that law and should not suffer adverse consequences for conforming their conduct to it.

Accordingly, our specific answer to the first certified question is that, where applicable, Maryland does recognize and would apply § 380(2) of the RESTATEMENT (FIRST). The question, as framed, is somewhat broader than that, however. It asks whether the District Court should follow the standard of care exception in § 380(2) "and apply the substantive law of the state where the erroneous interpretation took place." That aspect of the question assumes that, if Maryland would adopt § 380(2), the substantive law of North Carolina would apply.

That is not necessarily the case. We would apply North Carolina law only if and to the extent that such law, by statute or judicial decision, specifically determines the effect of applying the applicable North Carolina standard of care to the facts at hand. If there is a statute or judicial decision in North Carolina that would dictate whether the conduct of LabCorp, through its employees, did or did not breach the applicable standard of care, we would, subject to our conclusion with respect to the second certified question, act in conformance with that statute or judicial decision; otherwise, as both the forum State and the place of wrong, we would apply Maryland law. The submissions of counsel to us do not indicate that there is any North Carolina statute on point. The only question is whether the holding in *Azzolino v. Dingfelder, supra,* 315 N.C. 103, 337 S.E.2d 528, constitutes a judicial determination that LabCorp's conduct does not violate the applicable standard of care in North Carolina.

That is ultimately for the District Court to determine, but, because the solicitation of our view is implicit in the certified question, we shall note that our reading of *Azzolino* indicates that it does *not* constitute such a determination. The complaint in that case was that a physician who provided prenatal care to a pregnant woman neglected to inform her about the availability of amniocentesis and genetic counseling, which would have revealed that her fetus was afflicted with Down's

Syndrome. In response to the parents' action for wrongful birth, the North Carolina court assumed, *arguendo,* "that the defendants owed the plaintiffs a duty and that they breached that duty." *Id.* at 533. The court also assumed that the child's birth was the proximate result of the defendants' negligence. *Id.* The court denied recovery, however, because it was unwilling to recognize that any legally cognizable injury had occurred: "we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury." *Id.* at 534. Because the court assumed that there was a duty and breach, it never addressed the standard of care issue, in any context, but decided the case based solely on the lack of injury. That is not a § 380 issue. Under § 378 of the RESTATEMENT (FIRST), "[t]he law of the place of wrong [Maryland] determines whether a person has sustained a legal injury."

### Maryland Public Policy

■ We have not previously applied a public policy exception to the *lex loci delicti* doctrine, although our case law strongly indicates that we *would* do so in a proper case. We have long recognized, and have on occasion applied, such an exception under analogous *lex loci* principles and have implicitly recognized the exception in a tort action subject to *lex loci delicti.*

In breach of contract actions, this Court has traditionally applied the doctrine of *lex loci contractus,* under which, in deciding upon the validity and construction of a contract, we generally apply the law of the place where the contract was made. We have just as consistently held, however, that the *lex loci contractus* principle is not inflexible and that it "does not apply to a contract provision which is against Maryland public policy." *Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 188, 498 A.2d 605, 608 (1985) and cases cited there. We cautioned in *Bethlehem Steel* that "merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy" and that "for another state's law to be unenforceable, there must be a 'strong public policy against its enforcement in Maryland.'"

*Id.* at 189, 498 A.2d at 608, quoting in part from *Texaco v. Vanden Bosche,* 242 Md. 334, 340–41, 219 A.2d 80, 84 (1966). *See also National Glass v. J.C. Penney,* 336 Md. 606, 650 A.2d 246 (1994).

In *Hutzell v. Boyer,* 252 Md. 227, 249 A.2d 449 (1969) and *Hauch v. Connor, supra,* 295 Md. 120, 453 A.2d 1207, we applied a public policy exception in the context of workers' compensation statutes, which we recognized had some affinity to contract and tort principles but were sufficiently different from both to be considered separately. The issue in those cases was whether Maryland would allow a fellow-employee action—an action implicitly permitted under the Maryland workers' compensation law but not permitted under the law where the parties were employed (*Hutzell*) or where the accident occurred (*Hauch*).

In *Hutzell,* although the parties were temporarily employed in Virginia, the employment-related accident occurred in Maryland and the parties were both residents of Maryland. In rejecting application of the Virginia law, which otherwise would have been required, the Court observed that Maryland had "a genuine interest in the welfare of a person injured within its borders, who may conceivably become a public charge due to a disabling injury" and that "[t]he social and economic problems following in the wake of a serious injury as they may affect the dependents of the person injured are properly matters of public concern." *Hutzell,* 252 Md. at 233, 249 A.2d at 452. The *Hauch* court regarded that as a public policy exception and applied that exception to the situation in which the co-employees were residents of and employed in Maryland but where the accident occurred in Delaware.

In *Harford Mutual v. Bruchey,* 248 Md. 669, 238 A.2d 115 (1968), a Maryland couple sued a Maryland company in a Maryland court for damages arising from an automobile accident that occurred in Virginia. In addition to any direct personal injuries, the husband sued for loss of consortium, an action that, by statute, was not allowed in Virginia. We concluded that, under *lex loci delicti* principles, Virginia law

would generally apply, but acknowledged "the question of whether there is extant in Maryland such a strong public policy in favor of recovery by a husband for loss of consortium as to require its courts to refuse to apply the law of a sister State which does not recognize such a right." *Id.* at 674, 238 A.2d at 117. We concluded that there was "no such strong public policy." *Id.* We observed that a husband's right to recover for loss of consortium had been characterized as an "anachronism," a "fossil from an earlier era," an "anachronistic common law rule," and a "vestigial right," which, we said, "hardly indicates recognition of a strong public policy in Maryland in favor of recovery for deprivation of consortium." *Id.* at 675, 238 A.2d at 118.

Although we did not find in *Harford Mutual* a sufficiently clear and strong public policy to disregard the *lex loci delicti* in favor of allowing a loss of consortium claim, the case cannot be read other than as recognizing that there *is* a public policy exception to the *lex loci delicti* rule and that we *would* apply it in an appropriate case. *See also Linton v. Linton,* 46 Md. App. 660, 420 A.2d 1249 (1980); *Rhee v. Combined Enterprises, Inc.,* 74 Md.App. 214, 536 A.2d 1197, *cert. dismissed,* 314 Md. 123, 549 A.2d 385 (1988); *Black v. Leatherwood,* 92 Md.App. 27, 606 A.2d 295 (1992). We can find no principled basis upon which to recognize such an exception in contract and workers' compensation cases but to deny it in tort cases.

The question certified is thus presented: does denying Maryland residents the right to bring a wrongful birth action by applying North Carolina law violate the public policy of the State of Maryland? Should the District Court, in light of our response to the first certified question, still find this question relevant, our answer is "Yes."

This is not a case like *Harford Mutual,* which needs to be examined in context. Under long-established Maryland common law, only a husband could sue for loss of consortium in Maryland—for "the loss of society, affection, assistance, and conjugal fellowship" of his wife. The wife had no comparable right. *See Coastal Tank Lines v. Canoles,* 207 Md. 37, 113

A.2d 82 (1955). That anomaly was founded on the ancient common law premise that the husband was entitled to his wife's services and was obliged to support her but that the wife was not entitled to her husband's services and was not obliged to support him. *Id.* at 50–51, 113 A.2d at 88. As the clearest basis for maintaining that unequal right in the middle of the 20th Century, the *Coastal Tank Lines* Court quoted the pronouncement from the House of Lords decision in *Best v. Samuel Fox & Co., Ltd.* [1952] A.C. 716, affirming [1951] 2. K.B. 639, that "[t]he common law is a historical development rather than a logical whole, and the fact that a particular doctrine does not logically accord with another or others is no ground for its rejection." *Coastal Tank Lines,* at 48, 113 A.2d at 87.

In *Deems v. Western Maryland Ry.,* 247 Md. 95, 100–101, 231 A.2d 514, 517 (1967), decided a mere seven months before *Harford Mutual,* the Court, in considering a Constitutional equal protection challenge to such an unfair rule, decided, in lieu of either abolishing the action or extending it to the wife, to regard it, prospectively, as a joint action for injury to the marital relationship. Although preserving the action in its converted form, there is nothing in the *Deems* Opinion to suggest that the Court had any great attachment to the action; rather, it transformed the action into a joint one only to avoid having to resolve the Federal Constitutional attack on it, *Deems,* 247 Md. at 113, 231 A.2d at 524, and, indeed, the Court expressly cautioned that it was not deciding the effect that any Federal statute might have in "foreclosing any claim for consortium under the Maryland law." *Id.* at 115, 231 A.2d at 525. As noted, the *Harford Mutual* Court still considered the action, even in its new emanation, as vestigial, anachronistic, and a "fossil from an earlier era," and, consistently with the caution expressed in *Deems,* did not regard the existence of the action in Maryland as a reason not to apply Virginia law.

The right of parents to bring an action for wrongful birth is quite different. It is not a vestige of ancient common law illogic but, as we noted in *Kassama v. Magat,* 368 Md. 113, 134, 792 A.2d 1102, 1115 (2002), is of a type that, as a practical

matter, could not have been brought before the last half of the 20th Century. At its core, we said, it rests "to a large extent on the more recent advances in medical and scientific knowledge that made contraception more practical and reliable and made potential fetal injuries and defects detectable prior to birth, and even prior to conception, coupled with the loosening of the fetters on abortions triggered in 1973 by *Roe v. Wade.*" *Id.*

In *Reed v. Campagnolo, supra,* 332 Md. 226, 630 A.2d 1145, we pointed out that "[t]he clear majority of courts that has considered the type of medical malpractice case alleged by the Reeds has concluded that there is legally cognizable injury, proximately caused by a breach of duty," *id.* at 235–36, 630 A.2d at 1149–50, and that "there is at least some economic harm to the parents in these cases—a harm that can be quantified under the general rules relating to tort damages." *Id.* at 236, 630 A.2d at 1150. We expressly rejected the approach of *Azzolino* as contrary to both Maryland law and the law of most States, and adopted instead the view of the Massachusetts court in *Viccaro v. Milunsky,* 406 Mass. 777, 551 N.E.2d 8, 10 (1990) that the harm is not the birth itself but "the effect of the defendant's negligence on the [parents] resulting from the denial to the parents of their right, as the case may be, to decide whether to bear a child or whether to bear a child with a genetic or other defect." *Reed, supra,* 332 Md. at 237, 630 A.2d at 1150, quoting from *Viccaro.*

*Reed* was a carefully considered and deliberate recognition that, when prospective parents, relying on the negligent act or omission of a health care professional, elect to continue a pregnancy that they otherwise would have lawfully terminated and, as a result, are burdened with the cost and expense of raising a child with a serious genetic or other physical or mental defect, they have been injured and have a right to seek damages for that injury from the person whose negligence led to the injury. That right is a matter of important public policy in this State, flowing not only from this Court's considered view but as well from statute. *See* Maryland Code, § 20–209(b), of the Health General Article, precluding the State

from interfering with the decision of a woman to terminate her pregnancy at any time during the pregnancy if the fetus is affected by genetic defect or serious deformity or abnormality. We thus conclude that, if application of North Carolina law would preclude this cause of action on the ground stated in *Azzolino* that no injury has occurred, we would hold that aspect of North Carolina law to be contrary to clear, strong, and important Maryland public policy and would not apply it.

### *Duty to Scott Hood*

The third question certified to us is whether, when a laboratory analyzes an amniocentesis specimen and the results are provided to the mother's physician but relied on by both parents, the laboratory has a sufficient relationship with the father to give rise to a duty of care. The question stems from LabCorp's view that, even if, by applying Maryland law, Karen would have a cognizable cause of action, her husband Scott would not. LabCorp argues that (1) there was no relationship between it and Scott from which any duty to him could flow, and (2) the action hinges on the right that the plaintiff would have to terminate the pregnancy upon learning that the fetus was afflicted with CF, and that right belonged solely to Karen.

Our response to the question certified cannot be more than "maybe," because anything more definitive will depend upon subsidiary facts that are for the District Court to determine. We can, however, quickly dispose of LabCorp's notion that any duty of care to Scott is precluded as a matter of law because the right to terminate the pregnancy belonged solely to Karen. It is true that the ultimate decision whether to terminate a pregnancy ordinarily rests with the pregnant woman, but it is also true that, in many cases, especially when the woman is married, that decision is one jointly arrived at by the woman and her husband, as, from the facts presented to us, was the situation here. That Karen could have made the decision by herself is not a basis for holding, as a matter of law, that no duty of care extended to Scott.

Nothing that we said in *Dehn v. Edgecombe, supra,* 384 Md. 606, 865 A.2d 603; *Doe v. Pharmacia,* 388 Md. 407, 879 A.2d 1088 (2005), or any comparable case would preclude the finding of a duty to Scott as a matter of law. In *Dehn,* we confirmed the long-held view that, as a general rule, "recovery for malpractice against a physician is allowed only where there is a relationship between the doctor and patient." 384 Md. at 620, 865 A.2d at 611. The issue there was whether a wife could recover against a physician with whom she had no doctor-patient relationship based on the physician's alleged failure to give proper advice to her husband following the husband's vasectomy, as a result of which she became pregnant. We found no basis in *Dehn* to create an exception to the general rule that limited the scope of a physician's duty of care to that of the physician's patient and rejected the argument that mere foreseeability of harm sufficed to create a duty to the wife. We maintained the view that "it is only in a limited number of cases where a special relationship sufficient to impose a duty of care will be found in the absence of traditional tort duty," *id.* at 625, 865 A.2d at 614, and concluded that there was no basis for finding such a special relationship to exist in that case. There was no connection at all between the wife and the doctor, and we rejected the notion that mere awareness by the physician that the patient was married sufficed to create a special relationship with the wife or extend a duty to her. To do so, we noted, would serve to expand the duty to all potential sexual partners of the patient—a possibly large and unknowable class.

We followed a similar approach in *Doe.* The defendant there was a laboratory in the business of cultivating two strains of the HIV virus for research purposes. It periodically tested its employees for one of the strains but did not test for the second strain. If the test it used showed a positive result, a second test was conducted, but the second test could confirm only the one strain, and thus could not rule out the existence of the other. One of its employees once tested positive on the first test and negative on the second, but he was not told that the result of that might be a second strain infection. The

employee *did,* at some point, become infected with the second strain, as did his wife. The issue was whether the wife had a cause of action against the employer, and, applying the principles enunciated in *Dehn,* we held that she did not, as there was no duty of care running from the employer to her. As in *Dehn,* we were concerned that creating a duty to unknown sexual partners "would create an expansive new duty to an indeterminate class of people." *Doe, supra,* 388 Md. at 420, 879 A.2d at 1095.

There is, of course, one important distinction between those cases and this one. To extend a duty to Scott would not risk an extension to "an indeterminate class of people"—any and all potential sexual partners of the patient/client—but only to the father of the child who would be responsible for the child's support. There is thus no generically pragmatic impediment to recognizing such a limited extended duty. Still, although the existence of duty is a question of law, the answer to that question, as with most questions of law, is necessarily fact-based: does the evidence establish a sufficient relationship between Scott and LabCorp, given the nature of the task LabCorp was employed to perform, the circumstances surrounding its employment to perform that task, including any relationship Scott may have had with Ms. Kimball or Dr. Pinkert, and the use likely to be made of its report, to create a duty of care to Scott? Because the answer to that question requires some specific fact-finding, which is for the District Court to do, we are unable to provide a more definite answer.

**CERTIFIED QUESTIONS OF LAW ANSWERED AS SET FORTH ABOVE; COSTS TO BE EQUALLY DIVIDED BY THE PARTIES.**