Dissenting Opinion by Watts, J. Respectfully, I dissent. The United States District Court for the District of Maryland certified to this Court the following question of law: “Would application of Georgia’s interpretation of the pollution exclusion contained in the insurance policy issued by Liberty Mutual Insurance Company [ (“Liberty Mutual”) ] to the Salvation Army as excluding coverage for bodily injuries resulting from the ingestion of lead-based paint violate Maryland public policy?” Unlike the Majority, I would answer the certified question of law with a resounding “yes,” and hold that it is a violation of Maryland public policy to apply Georgia case law that permits a pollutant exclusion in an insurance policy to be interpreted as a lead-based paint exclusion because Maryland has a strong public policy of protecting children from injuries caused by lead-based paint and of requiring exclusions for lead-based paint to unambiguously and specifically indicate that the exclusion applies to lead-based paint to be valid. Under the choice of law principle of lex loci contractus, “when determining the construction, validity, enforceability, or interpretation of a contract, we apply the law of the jurisdiction where the contract was made.” Cunningham v. Feinberg, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015) (citations omitted). Nevertheless, the principle of lex loci contractus “is not inflexible and [ ] it does not apply to a contract provision which is against Maryland public policy.” Lab. Corp. of Am. v. Hood, 395 Md. 608, 620, 911 A.2d 841, 848 (2006) (citation and internal quotation marks omitted). This Court has stated, however, “that merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and that for another [Sjtate’s law to be unenforceable, there must be a strong public policy against its enforcement in Maryland.” Id. at 620, 911 A.2d at 848 (citation and internal quotation marks omitted). The key issue in this case—indeed, the very issue posed in the certified question of law—is whether Maryland has a strong public policy of protecting children from lead-based paint poisoning and in requiring that lead-based paint exclusions be specifically identified in insurance policies such that application of Georgia’s case law is unenforceable and would offend the principle of lex loci contractus. On this key issue, I depart from the view of the Majority, as I would conclude that there is a strong public policy expressed by the General Assembly in Maryland that renders the application of Ga. Farm Bureau Mut. Ins. Co. v. Smith, 298 Ga. 716, 784 S.E.2d 422, 423 (2016) unenforceable. Establishing clear public policy, Md. Code Ann., Ins. (1995— 97, 2011 Repl. Vol.) (“IN”) § 19-704, derived from former Md. Code, Art. 48A, §§ 734 and 736, concerning lead hazard coverage for rental property, provides, in pertinent part, as follows: (c) Exclusion of coverage.—Notwithstanding subsection (g) of this section, whenever an authorized insurer issues or renews a policy for an affected property, the authorized insurer may include in the policy a lead hazard coverage exclusion. An “affected property,” in turn, is defined in IN § 19-701(b) as follows: (1) “Affected property” means: (i) 1. a residential property constructed before 1950 that contains not more than one rental dwelling unit; or 2. a residential rental property that contains not more than one rental dwelling unit for which the owner makes an election under § 6-803(a)(2) of the Environment Article;[1] or (ii) an individual rental dwelling unit within: 1. a residential rental property constructed before 1950 that contains more than one rental dwelling unit; or 2. a residential rental property that contains more than one rental dwelling unit for which the owner makes an election under § 6-803(a)(2) of the Environment Article. (2) “Affected property” does not include property exempted under § 6-803(b) of the Environment Article.[2] IN § 19-704(c) does not provide that insurance policies containing pollutant exclusions are the equivalent of insurance policies containing lead hazard coverage exclusions. Stated otherwise, as IN § 19-704(c) demonstrates, a lead hazard coverage exclusion is different from a pollutant exclusion. Indeed, IN § 19-704(c) specifically provides that, with respect to certain properties—affected properties as that term is defined in IN § 19—701(b)—insurers may include within an insurance policy a lead hazard coverage exclusion. In other words, IN § 19-704(c) is a very specific statute that provides for a lead hazard coverage exclusion under detailed identified circumstances; this statute does not authorize a pollutant exclusion to operate as the equivalent of a lead hazard coverage exclusion. Indeed, the majority opinion explicitly recognizes that IN § 19-704 does not apply to pollutant exclusions in insurance policies. Without qualification, the Majority writes: “IN § 19-704(c) does not reference a duty for insurers to indemnify and defend lead-based paint claims through a pollution exclusion clause. It does not reference pollutants at all. Rather, it plainly states that insurers have the option to exclude coverage for lead-based paint related claims.” Maj. Op. at 599, 175 A.3d at 709. With this admission, the majority opinion concedes that IN § 19-704 offers no support for the proposition that it provides guidance with respect to public policy in Maryland concerning allowing pollutant exclusions in insurance policies to act as lead hazard coverage exclusions. Nonetheless, the majority opinion concludes that “Georgia’s decision holding that lead-based paint is a pollutant, is not at odds with Maryland’s public policy where our General Assembly has not directly indicated otherwise[.]” Maj. Op. at 606, 175 A.3d at 710. The majority opinion apparently reasons that there is a lack of strong public policy against pollutant exclusions being treated as lead hazard coverage exclusions because the General Assembly has not expressly addressed the issue of pollutant exclusions covering lead-based paint. The majority opinion, however, ignores the strong public policy implications of IN § 19-704(c)’s unambiguous permission of lead hazard coverage exclusions only, ie., lead-based paint exclusions must be clear and unequivocal. Significantly, in Sullins v. Allstate Ins. Co., 340 Md. 503, 506, 509, 516, 518, 667 A.2d 617, 618, 620, 623, 624 (1995), in response to a certified question of law from the United States District Court for the District of Maryland, in a thorough and well-reasoned opinion, this Court determined that the terms “contaminants” and “pollutants” in a pollutant exclusion of an insurance policy were ambiguous and susceptible to different meanings, including meanings not encompassing lead-based paint, and that, in accordance with Maryland law, the insurance policy at issue could not be construed to include lead-based paint as a contaminant or pollutant, and instead was to be construed against the insurer as the drafter of the policy, such that the insurer was not relieved of its duty to defend in the underlying lead-based paint poisoning lawsuit. In Sullins, id. at 506-07, 667 A.2d at 618, the pollutant exclusion at issue, contained in a section labeled “Losses We Do Not Cover,” provided: We do not cover bodily injury or property damage which results in any manner from the discharge, dispersal, release, or escape of: a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses; b) waste materials or other irritants, contaminants or pollutants. In construing the terms “contaminants” and “pollutants,” and determining whether lead-based paint was a contaminant or pollutant, this Court observed that the terms were “susceptible of two interpretations by a reasonably prudent layperson. By one interpretation, these terms encompass lead paint; by another interpretation, they apply only to cases of environmental pollution or contamination, and not to products such as lead paint.” Id. at 509, 667 A.2d at 620. This Court explained that, “[wjhile lead is clearly ‘toxic,’ a reasonably prudent layperson may not view lead as a ‘chemical[,]’ ” and that “[similarly, a reasonably prudent layperson may not generally think of lead as an ‘irritant.’ ” Id. at 510, 667 A.2d at 620. This Court acknowledged, however, that a reasonably prudent layperson could consider lead to be a “contaminant” or a “pollutant” under the ordinary dictionary definitions of those terms. See id. at 511, 667 A.2d at 620. On the other hand, this Court noted that “[a] reasonably prudent layperson may also interpret the terms ‘contaminant’ and ‘pollutant’ as not including lead paint.” Id. at 511, 667 A.2d at 620 (emphasis in original). This Court further observed that courts in other jurisdictions had found the term “pollutant” both ambiguous and unambiguous with respect to lead-based paint. See id. at 511, 667 A.2d at 620-21. This Court also examined the history of the pollutant exclusion, and determined that the history supported the conclusion that a reasonably prudent layperson may not consider lead-based paint to be either a pollutant or a contaminant. See id. at 513, 667 A.2d at 621-22. The original pollutant exclusions were drafted by insurers in response to environmental catastrophes that occurred in the 1960s to clarify that commercial general liability insurance policies did not indemnify knowing polluters. See id. at 514, 667 A.2d at 622. That “sudden and accidental” pollutant exclusion, which specifically referenced “into or upon land, the atmosphere or any watercourse or body of water[,]” “was intended to eliminate coverage for damages from pollution of the environment.” Id. at 514, 667 A.2d at 622 (citations omitted). Thereafter, in 1985, the insurance industry adopted the “ ‘absolute pollution exclusion!!,]’ which denied coverage for ‘bodily injury or property damage arising out of the actual, alleged or threatened discharge, release, or escape of pollutants’ and defined ‘pollutant’ as ‘any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalies, chemicals and waste.’ ” Id. at 514-15, 667 A.2d at 622. In adopting the “absolute pollution exclusion,” and using environmental terms of art such as “discharge, dispersal, release, or escape,” insurers deleted as redundant reference to “into or upon land, the atmosphere or any watercourse or body of water.” Id. at 515, 667 A.2d at 622. This Court explained that there was “no indication that the change in the language was meant to expand the scope of the clause to non-environmental damage.” Id. at 515, 667 A.2d at 622 (citation and internal quotation marks omitted). Indeed, this Court concluded that the use of environmental law terms of art such as “discharge,” “dispersal,” “release,” “escape,” “contaminant,” and “pollutant” in the absolute pollution exclusion demonstrated that the insurance “industry’s intention was to exclude only environmental pollution damage from coverage!!.]” Id. at 515, 667 A.2d at 622-23. Accordingly, in Sullins, this Court determined that the history of the pollutant exclusion supported “our conclusion that a reasonably prudent layperson may interpret the terms ‘pollution’ and ‘contamination,’ in the circumstances of the case now before us, as not encompassing lead paint, a product used legally and intentionally.” Id. at 516, 667 A.2d at 623 (emphasis in original). And, because the terms “pollution” and “contamination” were ambiguous, this Court held that they had to be construed against the insurer as the drafter of the insurance policy. See id. at 516, 667 A.2d at 623. What can be gleaned from Sullins is that, where an insurance policy contains a pollutant exclusion with ambiguous terms—terms that could be interpreted to have multiple meanings when viewed by a reasonably prudent layperson— such terms must be construed against the drafter of the policy, ie., the insurer. Moreover, as explained in Sullins, tracing the history of the pollutant exclusion demonstrates that pollutant exclusions originated as a means of excluding coverage for damage caused by environmental pollution, not for damage caused by non-environmental pollution of the type that could result from the legal use of products in residences. Additionally, notably, Sullins supports the conclusion that exclusions from coverage for injuries caused by lead-based paint must unambiguously include lead-based paint as a pollutant to be valid. This is not the status of Georgia case law. In 2016, in Ga. Farm, 784 S.E.2d at 428, the Supreme Court of Georgia concluded that lead-based paint was a “pollutant” as defined by the applicable insurance policy such that the “pollution exclusion” in the insurance policy applied to exclude coverage of personal injury claims arising from lead-based paint poisoning. This is the case that the Majority finds to be controlling. In Ga. Farm, id., Amy Smith (“Smith”), in her individual capacity and on behalf of her daughter Tyasia Brown (“Brown”), sued her landlord, Bobby Chupp (“Chupp”), for injuries that Brown allegedly sustained from lead-based paint poisoning that occurred in the house that Smith rented from Chupp. During the relevant time, Chupp’s house was insured under a commercial general liability insurance policy issued by Georgia Farm Bureau Mutual Insurance Company (“Georgia Farm”), which contained a “pollution exclusion” that provided as follows: This insurance does not apply to: [[Image here]] (f) Pollution (1) “Bodily injury” or “property damage” arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of “pollutants”: (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. Id. (ellipsis in original). The insurance policy defined the term “pollutant” as “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkal-is, chemicals and waste.” Id. In the trial court, Georgia Farm argued, in pertinent part, that the pollutant exclusion applied to Brown’s alleged injuries from lead poisoning, ie., that the claims were excluded from coverage, and that, accordingly, it was relieved of its contractual duty to defend and indemnify Chupp in the lawsuit. See id. The trial court agreed and granted summary judgment in Georgia Farm’s favor, finding “that lead-based paint unambiguously fell within the policy’s definition of a ‘pollutant,’ and, as a result, Brown’s alleged injuries were excluded from coverage pursuant to the pollution exclusion clause.” Id. In so ruling, the trial court relied on Reed v. Auto-Owners Ins. Co., 284 Ga. 286, 667 S.E.2d 90, 92 (2008), in which the Supreme Court of Georgia interpreted an identical pollutant exclusion contained in a commercial general liability insurance policy insuring residential rental property and held that, although not expressly identified in the insurance policy as a pollutant, carbon monoxide gas was a pollutant and, therefore, the plaintiffs injuries arising from carbon monoxide poisoning were excluded from coverage under the pollutant exclusion. See Ga. Farm, 784 S.E.2d at 423-24. Notably, in Ga. Farm, id. at 424, on appeal to the Court of Appeals of Georgia, that Court reversed the trial court’s judgment in favor of Georgia Farm, observing that there existed a conflict in other jurisdictions as to whether lead-based paint should be considered a pollutant for purposes of a pollutant exclusion in an insurance policy. In light of Georgia law requiring the narrow construction of exclusions from coverage in insurance policies, the Court of Appeals of Georgia was persuaded to follow the example of jurisdictions that had held that a pollutant exclusion did not bar coverage for injuries arising from lead-based paint poisoning. See id. Significantly, the Court of Appeals of Georgia relied on this Court’s opinion in Sullins, 340 Md. at 509-10, 667 A.2d at 620, and concluded that, “with respect to allegations of bodily injury arising from exposure to lead-based paint, the terms ‘contaminants’ and ‘pollutants’ used in a [commercial general liability] policy’s pollution exclusion were ambiguous and should be strictly construed against the insurer[.]” Ga. Farm, 784 S.E.2d at 424 (citation omitted). The Court of Appeals of Georgia determined that Georgia Farm had failed to demonstrate that lead-based paint was a “pollutant” as defined by the insurance policy. See id The Court of Appeals of Georgia distinguished Reed, the case relied on by the trial court, “finding that, while a straightforward reading of the pollution exclusion in Reed compelled the conclusion that carbon monoxide gas was a pollutant, it was unclear whether identical language in the instant policy was expansive enough to unambiguously include lead, lead-based paint or paint as a pollutant.” Ga. Farm, 784 S.E.2d at 424 (citation omitted). Thereafter, Georgia Farm filed a petition for a writ of certiorari, which the Supreme Court of Georgia granted. See id. Ultimately, the Supreme Court of Georgia reversed the judgment of the Court of Appeals of Georgia, and relied on Georgia precedent in which Georgia courts had interpreted pollutant exclusions to apply to all injuries caused by pollutants, even those caused by something other than traditional environmental pollution, and that the term “pollutant” applies to any contaminant and the contaminant need not be expressly identified in the insurance policy for a pollutant exclusion to be valid. See id. at 425. After discussing applicable Georgia case law, the Supreme Court of Georgia concluded that, “[ujnder the broad definition contained in Chupp’s policy, ... lead present in paint unambiguously qualifies as a pollutant and [ ] the plain language of the policy’s pollution exclusion clause thus excludes Smith’s claims against Chupp from coverage.” Id. at 426 (footnote omitted). This outcome would not have been the same had the circumstances of the case been analyzed under the principles set forth by this Court in Sullins. The majority opinion attempts to distinguish this Court’s holding in Sullins by inaccurately claiming that the policy at issue in Georgia Farm was different because the policy contained a definition of the term pollutant and, in Georgia Farm, “[t]he Supreme Court of Georgia read that the plain language of the pollutant definition was matter, in any state, acting as an irritant or contaminante,]” whereas in the pollution exclusion at issue in Sullins, the term pollutant was not defined. Maj. Op. at 590-91, 175 A.3d at 704 (citation and internal quotation marks omitted). The definition of the term pollutant in the pollution exclusion at issue in Georgia Farm, 784 S.E.2d at 423, was in actuality as set forth above—“any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste”—and the definition did not unambiguously define pollutant to include lead-based paint. Rather than relying on the plain language of the exclusion, in reversing the intermediate appellate court, the Supreme Court of Georgia utilized Georgia case law in which Georgia courts had earlier determined that the term “pollutant” applies to any contaminant, and the contaminant need not be expressly identified in the insurance policy for a pollutant exclusion to be valid. See id. at 425. Thus, in Georgia Farm, the term pollutant was not defined in a manner that merely allowed a plain language determination that the term included lead-based paint, and such is not the circumstance in this case either. To be sure, public policy in Maryland permits an insurance policy to contain an exclusion for coverage for injuries caused by lead-based paint. IN § 19-704(c) speaks for itself, authorizing insurers to include lead hazard coverage exclusions under certain narrow circumstances. Nevertheless, the Liberty Mutual insurance policy at issue in this case does not contain a lead hazard coverage exclusion; it contains a pollutant exclusion. Indeed, the Majority specifically acknowledges that, “[njotably, the policies do not include lead-based paint exclusion provisions, but the policies do include pollution exclusion provisions.” Maj. Op. at 583, 175 A.3d at 700. After conceding that the Liberty Mutual exclusion is a pollution exclusion and not a lead hazard coverage exclusion, the majority opinion concludes that “the General Assembly’s explicit dictation of the State’s public policy in IN § 19-704, a year after this Court held that an insurer had a duty to defend a lead-based paint related injury in Sullins, illustrates that the General Assembly is responsible for establishing public policy.” Maj. Op. at 599, 175 A.3d at 709 (citing Sullins, 340 Md. at 518, 667 A.2d at 624). The majority opinion overlooks the legislative history of IN § 19-704. What is now IN § 19—704(c) was originally enacted by the General Assembly in 1994 as part of the Lead Poisoning Prevention Program Act. See 1994 Md. Laws 1282, 1343 (Ch. 114, H.B. 760). The Lead Poisoning Prevention Program Act took effect on October 1, 1994, and the session law provided “[t]hat, notwithstanding other provisions of this Act, this Act shall apply beginning on January 1, 1995 to insurance policies issued or renewed between October 1, 1994 and December 31, 1994.” Id. at 1347. As originally enacted, Md. Code (1994 Repl. Vol, 1995 Supp.), Art. 48A, § 735(a)—the section that is now IN § 19-704(c)—provided: (a) Provision.—Notwithstanding subsection (f) of this section, upon the inception or renewal of a policy, an insurer may provide for a lead hazard exclusion with respect to a policy of insurance covering an affected property. In 1996, as part of adding certain titles to the Insurance Article, Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) was recodified without substantive change as IN § 19-704(c). See 1996 Md. Laws 235, 236, 524-28 (Ch. 11, H.B. 11). That recodification took effect on October 1, 1997. See 1996 Md. Laws 693 (Ch. 11, H.B. 11). As recodified, IN § 19-704(c) provided, and continues to provide, as follows: (c) Exclusion of coverage.—Notwithstanding subsection (g) of this section, whenever an authorized insurer issues or renews a policy for an affected property, the authorized insurer may include in the policy a lead hazard coverage exclusion. The history of IN § 19-704 demonstrates that the lead hazard coverage exclusion in Maryland preceded the Court’s decision in Sullins. It is inaccurate to link the enactment of IN § 19-704 to Sullins in any way. This Court issued Sullins on November 6, 1995, after Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) was enacted and became effective. However, Sullins involved an insurance policy that was issued on September 14, 1990; ie., Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) would not have applied to the policy at issue in that case. And, in Sullins, this Court did not discuss or mention Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) or the Lead Poisoning Prevention Program Act. Moreover, Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) was recodified in 1996 as IN § 19-704(c) without substantive change. As stated, Sullins was decided in 1995. In recodifying Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) in 1996, the General Assembly would have been aware of this Court’s decision in Sullins, and could have made changes to the lead hazard coverage exclusion to enlarge it to encompass pollutant exclusions generally, but the General Assembly did not do this. It is clear that the strong public policy in Maryland is that a lead-based paint exclusion must be unambiguous. Undoubtedly, one of the purposes of IN § 19-704(c) and its predecessor is plainly to prevent insureds from signing insurance policies and being unaware that coverage for injuries caused by lead-based paint is excluded. Ultimately, in Maryland, there is a strong public policy of protecting children from injuries caused by lead-based paint and of requiring that lead-based paint exclusions in insurance policies be clear and unambiguous. This is evident from statutes enacted by the General Assembly. For example, in Md. Code Ann., Hous. & Cmty. Dev. (2005-06) § 4-702, part of the subtitle governing the lead hazard reduction grant program and lead hazard reduction loan program, the General Assembly specifically made the following findings: The General Assembly finds that: (1) lead paint is present in a large percentage of residential properties in the State, particularly residential rental properties constructed before 1950; (2) lead paint on the friction surfaces of windows is a leading cause of lead poisoning; (3) lead poisoning harms the health and well-being of children and pregnant women and causes substantial long-term public costs for medical expenses and additional education; and (4) reduction or elimination of lead in the environment will reduce: (i) the risk of lead poisoning of children and pregnant women; (ii) the incidence of learning disabilities and behavioral problems in children who live in older housing; and (iii) the cost of publicly financed medical care. I would conclude that there is an equally strong public policy in Maryland, as demonstrated by Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a), and its recodification without substantive change to IN § 19-704(c) after this Court’s decision in Sullins, that for an insurance policy exclusion from coverage of injuries caused by lead-based paint to be valid, the exclusion must be explicit and unambiguous. Stated otherwise, in my view, IN § 19-704(c), its predecessor, and the existence of this Court’s decision in Sullins inescapably lead to the conclusion that a lead-based paint exclusion in an insurance policy must be expressly and unambiguously identified, either through a lead hazard coverage exclusion of the type authorized by IN § 19-704(c) or through some other exclusion, which expressly includes lead-based paint for purposes of the exclusion. Respectfully, the Majority’s conclusion that, under Georgia case law, an insurance contract with a pollution exclusion is enforceable as a lead-based paint exclusion and that this does not violate Maryland’s public policy is in direct contradiction with this Court’s holding in Sullins, in which this Court answered the same certified question to the contrary. I would determine that the pollutant exclusion in the Liberty Mutual insurance policy runs afoul of a strong Maryland public policy on its face by failing to specifically and unambiguously include lead-based paint as a “pollutant” covered in the pollutant exclusion. The definition of “pollutant” contained in the Liberty Mutual insurance policy—“any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste”—is ambiguous and a reasonably prudent layperson both may and may not believe lead-based paint to be a “pollutant” based on the plain language of the pollutant exclusion contained in the Liberty Mutual insurance policy. And, notably, the Liberty Mutual pollutant exclusion contains environmental law terms of art such as “discharge,” “dispersal,” “seepage,” “migration, “release”, and “escape,” which, as this Court explained in Sullins, 340 Md. at 515-16, 667 A.2d at 622-23, supports the conclusion that the insurance industry intended pollutant exclusions to apply only to environmental pollution damage, and not necessarily to the lawful use of products in the home, and that a reasonably prudent layperson could “interpret the term[ ] ‘pollution’ ... as not encompassing lead paint, a product used legally and intentionally.” (Emphasis in original). I would conclude that the public policy exception to the principle of lex loci contractus is applicable, and I would answer the certified question of law “yes,” and hold that it would violate Maryland public policy to apply Georgia case law, specifically, the Ga, Farm case, under the circumstances of this case because Maryland has both a strong public policy of protecting children from injuries caused by lead-based paint and of requiring exclusions for lead-based paint to be unambiguous to be valid. For the above reasons, respectfully, I dissent. . Md. Code Ann., Envir. (1982, 1987, 2013 Repl. Vol.) ("EN”) § 6-803(a)(2) provides that Subtide 8, concerning reduction of lead risk in housing, applies to, "[n]otwithstanding subsection (b) of this section, any residential rental property, the owner of which elects to comply with this subtitle.” . EN § 6-803(b) provides that Subtitle 8, concerning reduction of lead risk in housing, does not apply to: (1) Property not expressly covered in subsection (a) of this section; (2) Affected property owned or operated by a unit of federal, State, or local government, or any public, quasi-public, or municipal corporation, if the affected property is subject to lead standards that are equal to, or more stringent than, the risk reduction standard established under § 6-815 of this subtitle; or (3) Affected property which is certified to be lead-free pursuant to § 6-804 of this subtitle.