*Quanta Brownlee, et al., v. Liberty Mutual Fire Insurance Co. et al.*, Misc. No. 1, September Term 2017. Opinion by Hotten, J.

**CERTIFIED QUESTION OF LAW – PUBLIC POLICY – INSURANCE LIABLILITY**

The Court of Appeals of Maryland answered a certified question posed before it by the United States District Court for the District of Maryland in the negative. In applying the rule of *lex loci contractus* with respect to an insurance contract made in Georgia, the Court of Appeals determined that application of Georgia's interpretation of the pollution exclusion clause in an insurance policy issued by the Liberty Mutual Insurance Company to the Salvation Army as excluding coverage for bodily injuries resulting from the ingestion of lead-based paint does not violate Maryland public policy.

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 1

September Term, 2017

_____

QUANTA BROWNLEE, ET AL.

v.

LIBERTY MUTUAL FIRE
INSURANCE CO. ET AL.

_____

Barbera, C.J.,
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Hotten, J.
Watts, J., dissents.

_____

Filed: December 18, 2017

This Court has been asked to answer a certified question of law by the United States District Court for the District of Maryland. The Maryland Uniform Certification of Questions of Law Act, Maryland Code, §§ 12-601, 12-613 of the Courts and Judicial Proceedings Article ("CJ") empowers this Court to "answer a question of law certified to it by a court of the United States…if the answer may be determinative of an issue in a pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this State." CJ § 12-603.

The United States District Court for the District of Maryland has asked us to answer the following question:

> Would application of Georgia's interpretation of the pollution exclusion contained in the insurance policy issued by Liberty Mutual Insurance Company to the Salvation Army as excluding coverage for bodily injuries resulting from the ingestion of lead-based paint violate Maryland public policy?

We answer this question in the negative. For reasons to be explained, we hold that application of Georgia law concerning the pollution exclusion in the policy under the principle of *lex loci contractus* does not violate Maryland public policy.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

---

[1] These facts are adopted from the factual allegations set forth in Appellants' and Appellees' briefs.

Quanta Brownlee, Jamal Brownlee, Shakeira Jones, Daquane[2] Jones, and De'Aunttae Jones (collectively "Appellants") were exposed to lead-based paint at a property, owned by the Salvation Army, located at 1114 North Calvert Street in Baltimore City, Maryland.

In 1995, Appellants Quanta Brownlee and Jamal Brownlee resided at the property, which contained deteriorated lead-based paint. Appellants sustained permanent brain damage and elevated blood lead levels as a result of the exposure to lead-based paint. In 2001, Shakeira Jones, Daquane Jones, and De'Aunttae Jones also resided at the property. Shakeira Jones, Daquane Jones, and De'Aunttae Jones also sustained permanent brain damage and elevated blood lead levels as a result of the exposure to lead-based paint.

Appellants named the Salvation Army as a defendant in their lead-based paint related tort claims in a complaint that is now pending in the United States District Court for the District of Maryland.[3] In addition to alleging that there was no insurance available in connection with Appellants' claim, the Salvation Army asserted that it was immune from liability on charitable immunity grounds, unless and until Liberty Mutual indemnified it as responsible for Appellants' injuries and damages. The parties do not dispute that Liberty Mutual issued comprehensive general liability insurance policies ("the Liberty Mutual

---

[2] In Appellants' brief, Daquane Jones' name is spelled inconsistently, sometimes being referenced as Dequane Jones. The remainder of this Opinion will reference the Appellant as Daquane Jones.

[3] Appellants brought their action in the Circuit Court for Baltimore City. Liberty Mutual removed the action to the United States District Court for the District of Maryland.

insurance policies") to the Salvation Army, or that these policies were purchased in Georgia, and were effective from October 1, 1993 until October 1, 2001.

Notably, the policies do not include lead-based paint exclusion provisions, but the policies do include pollution exclusion provisions. The pollution exclusion provision is written as such:

> This insurance does not apply to:
> (f) Pollution
>
> (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:
>
> (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured ….

Complaint, Exhibit 4 at 82. "Pollutants" are defined in each of the Liberty Mutual insurance policies as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemical or waste." *Id.* at 83.

Appellants seek affirmation from this Court that Liberty Mutual is obligated to indemnify the Salvation Army and defend against claims brought by the Appellants. Appellee Liberty Mutual asserts that it is under no obligation to indemnify and defend Appellee Salvation Army because: (1) the Liberty Mutual insurance policies were formed in Georgia, thus implicating the legal principle of *lex loci contractus i.e.*, the law governing the contracts is the law of the place where the contract is formed, and (2) pursuant to Georgia law, the pollution exclusion provision in the insurance policies excluded coverage for bodily injuries resulting from exposure to lead-based paint.

3

The Supreme Court of Georgia has held that bodily injuries allegedly resulting from the ingestion of lead-based paint are within the pollution exclusion. *See Georgia Farm Bureau of Mut. Ins. Co. v. Smith*, 298 Ga. 716, 784 S.E.2d 422 (2016). The language of the pollution exclusion clause in *Georgia Farm* is identical to the language of the pollution exclusion clause in the Liberty Mutual insurance policies.

Liberty Mutual has moved to dismiss the complaint on the ground that Maryland courts follow the doctrine of *lex loci contractus* in choosing the applicable law, *Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Allstate Ins. Co. v Hart*, 327 Md. 526, 529, 611 A.2d 100, 101 (1992) and that, under Georgia law, the insurance policy does not cover claims for lead-based paint poisoning. To the contrary, Appellants contended in the federal district court that Maryland courts would not apply Georgia's interpretation of the pollution exclusion clause because it violates Maryland's public policy. The United States District Court for the District of Maryland asks us resolve which law applies, so that the federal court may decide the merits on Liberty Mutual's Motion to Dismiss. This Court must answer whether application of Georgia's decision in *Georgia Farm* violate Maryland's public policy.

## DISCUSSION

### I. *Lex Loci Contractus*

It is not in dispute that the doctrine of *lex loci contractus* is applicable here. Both parties agree that *lex loci contractus* is the proper lens through which this Court should analyze their claims. Maryland has long recognized the doctrine of *lex loci contractus*. *See*

4

*De Sobry v. De Laistre*, 2 H. & J. 191, 191 (1807) (applying the laws of the country where the terms of the contract were created). When this Court applies *lex loci contractus*, typically either the validity or enforceability of a contract is at issue. *Cunningham*, 411 Md. at 327–28, 107 A.3d at 1205. The "doctrine requires that, when determining the construction, validity, enforceability, or interpretation of a contract, we apply the law of the jurisdiction where the contract was made." *Id.* at 326, 107 A.3d at 1204. Therefore, the substantive application of the law to the contract between the parties is subject to the enforcement of the jurisdiction where the contract was formed. *Id.*

The rule of *lex loci contractus*, however, has a narrow exception. Maryland law still governs when a contractual provision is contrary to a strong Maryland public policy. "Nevertheless, for Maryland public policy to override the *lex loci contractus* rule, the public policy must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction." *Hart*, 327 Md. at 530, 611 A.2d at 102. *See Lab. Corp. of Am. v. Hood*, 395 Md. 608, 620, 911 A.2d 841, 848 (2006) (opining that the *lex loci contractus* principle is "not inflexible" and that it will not govern a contract provision that is against Maryland public policy) (internal citations omitted); *Cunningham*, 441 Md. at 337, 107 A.3d at 1211 (explaining that this Court has "long recognized an exception to the application of *lex loci contractus:* we refuse to apply the doctrine when doing so would be 'contrary to a strong public policy of this State[ ]'") (*quoting Am. Motorists Ins. Co. v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995)); *Bethlehem Steel Corp. v. G.C. Zarnas & Co.*, 304 Md. 183, 188–89, 498 A.2d 605, 608

(1985) (recognizing the choice of law rule which has been consistently recognized by this Court, "*lex loci contractus* does not apply to a contract provision which is against Maryland public policy[ ]"). Thus, absent a determination that Georgia's law violates a strong Maryland public policy, Georgia's law applies.

## II.    Authority on Pollution Exclusion Clauses

Both Appellants and Appellees agree that, under Georgia case law, the Liberty Mutual insurance policies in question do not cover claims for lead-based paint poisoning. Because the Liberty Mutual insurance policies were issued in Georgia, and the *lex loci contractus* doctrine is applicable, Georgia's law must be examined first. The Supreme Court of Georgia examined a pollution exclusion provision using identical language as the insurance contract currently before this Court. *Georgia Farm*, 298 Ga. at 717, 784 S.E.2d at 423. *See Id.* (defining a "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste[ ]").

In *Georgia Farm*, the plaintiff, a residential tenant, sued her landlord for injuries sustained when plaintiff's daughter allegedly ingested lead from deteriorating lead-based paint in the rented house. *Id.* The landlord insured the residence through a general commercial liability insurance policy issued by Georgia Farm Bureau Mutual Insurance Company ("Georgia Farm"). Following an insurance claim initiated by the landlord, Georgia Farm filed a declaratory judgment action against Plaintiff and the landlord. Georgia Farm argued that the daughter's lead-based poisoning injuries were not covered by the policy because of a pollution exclusion provision, thus discharging Georgia Farm's

6

obligation to defend or indemnify the landlord in the lawsuit. The Supreme Court of Georgia held that lead present in paint "unambiguously qualifies as a pollutant and that the plain language of the policy's pollution exclusion clause" removed plaintiff's claims against her landlord from coverage. *Id.* at 721, 784 S.E.2d at 426. The *Georgia Farm* Court discussed this Court's analysis in *Sullins v. Allstate Ins. Co.* when reversing the Court of Appeals of Georgia's determination that Georgia Farm had a duty to defend the landlord. [4]

*Sullins v. Allstate Ins. Co*, 340 Md. 503, 667 A.2d 617 (1995); *Georgia Farm*, 298 Ga. St 716, S.E.2d at 422 (2016); *Smith v. Georgia Farm Bureau Mut. Ins. Co.*, 331 Ga. App. 780, 786, 771 S.E.2d 452, 457 (2015), *cert. granted* (July 6, 2015), *rev'd,* 298 Ga. 716, 784 S.E.2d 422 (2016), and *vacated,* 337 Ga. App. 300, 789 S.E.2d 193 (2016).

In *Sullins*, we reviewed an insurance policy's pollution exclusion clause. 340 Md. at 509, 667 A.2d at 620. The insurance policy language at issue in *Sullins* differed from the language in Appellants' insurance policies. In *Sullins*, the Allstate Insurance Company ("Allstate") issued a Deluxe Homeowners Policy to Reverend D. Paul Sullins and Patricia H. Sullins. *Id.* at 506–07, 667 A.2d at 618. In Sullins' policy, under the heading "Losses We Do Not Cover," the policy contained the following language:

> We do not cover bodily injury or property damage which results in any manner from the discharge, dispersal, release, or escape of:
>
>> a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses;
>>
>> b) waste materials or other irritants, contaminants or pollutants.

---

[4] The Court of Appeals of Georgia is Georgia's intermediate appellate court. WELCOME TO THE COURT OF APPEALS OF GEORGIA, http://www.gaappeals.us/ (https://perma.cc/S6FD-LS43) (last visited December 15, 2017).

*Id.* We determined that "contaminants" and "pollutants" are susceptible to two different interpretations by a lay person. *Id.* at 509, 667 A.2d at 620. One interpretation of the two terms could reasonably encompass lead-based paint, while another could refer to environmental contaminants or pollutants. *Id.* However, we noted that "[to] be sure that lead paint poisoning claims were excluded from coverage, [the insurer] could have included a provision…explicitly excluding such claims." *Id.* at 518 n.3, 667 A.2d at 624 n.3. The *Sullins* Court ruled that the policy language was ambiguous and did not remove the insurer's duty to defend the lead-based paint poisoning action. *Id.* at 518, 667 A.2d at 624.

Georgia's intermediate appellate court, the Georgia Court of Appeals, cited *Sullins* for the proposition that if an insurer "had intended to exclude injuries caused by lead-based paint from coverage in the policy at issue in this case it was required, as the insurer that drafted the policy, to specifically exclude lead-based paint injuries from coverage." *Smith*, 331 Ga. App. at 785, 771 S.E.2d at 456 (footnote omitted) (internal citations omitted). Georgia's intermediate appellate court went on to explain that, as in *Sullins*, "an insured could reasonably have understood the provision at issue to exclude coverage for injury caused by certain forms of industrial pollution, but not coverage for injury allegedly caused by the presence of leaded materials in a private residence." *Id.* However, the Supreme Court of Georgia disagreed that the insurance policy terms at issue here created the same ambiguities. *Georgia Farm*, 298 Ga. at 716, 784 S.E.2d at 423. Like in *Sullins*, the *Georgia Farm* court considered that if "a policy provision is susceptible to more than one meaning, even if each meaning is logical and reasonable, the provision is ambiguous and….will be

8

construed strictly against the insurer/drafter and in favor of the insured." *Georgia Farm*, 298 Ga. at 719, 784 S.E.2d at 424–25 (internal citations omitted). The *Georgia Farm* court determined that the pollution exclusion clause was unambiguous and held that the "policy contains an absolute pollution exclusion clause which precludes recovery for bodily injury or property damage resulting from exposure to any pollutant." *Id.* at 719, 784 S.E.2d at 425.

Our decision in *Sullins*, and Georgia's application of the pollution exclusion clause in *Georgia Farm* can coexist. The law of our State and Georgia's law are not so contrary because the insurance policy terms at issue here, and the terms at issue in *Sullins*, are different. *Sullins* required us to interpret the pollution exclusion clause because the terms were undefined and ambiguous, and thus susceptible to multiple interpretations. That is not the case here. The Liberty Mutual insurance policies define 'Pollutants' as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemical or waste." *See supra* Complaint, Exhibit 4 at 83. The *Sullins* Court took issue with ascertaining the intention of the parties because the parties did not define the pollution exclusion's terms as they have here. *Sullins*, 340 Md. 503 at 514, 667 A.2d at 622. The *Sullins* Court was then forced to analyze the historical context and the parties' intentions to determine the contract's meaning. *Id.* However, *lex loci contractus* does not require us to interpret the terms of the Liberty Mutual insurance policies, or determine the intent of the parties, because Georgia's Court already has determined that is not a relevant line of analysis here. *Georgia Farm*, 298 Ga. at 720, 784 S.E.2d at 425.

9

The *Sullins* Court was required to perform a full review of pollution exclusion clause history to ascertain the parties' intentions. Similarly to the Supreme Court of Georgia, we noted that insurance exclusion clauses in their infancy generally applied to accidental contamination. *Sullins*, 340 Md. at 513–15, 667 A.2d at 622–23; *Georgia Farm*, 298 Ga. at 719, 784 S.E.2d at 425. Both *Sullins* and *Georgia Farm* acknowledged that in the mid-1980s, the insurance industry adopted the "absolute pollution exclusion," which denied coverage for bodily injury arising from pollutants. *Sullins*, 340 Md. at 514–15, 667 A.2d at 622; Georgia Farm, 298 Ga. at 719, 784 S.E.2d at 425. At this point, the discussion in *Georgia Farm* and *Sullins* diverges. *Sullins* decided that the insurance industry's absolute pollution exclusion, which denied coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, release, or escape of pollutants" and defined "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalies, chemicals and waste[,]" were environmental terms of art, and thus the parties intended environmental hazards, and not lead-based paint, to be excluded. *Sullins*, 340 Md. at 515, 667 A.2d at 622.

*Georgia Farm* relied on its past decision in *Reed v. Auto-Owners Ins. Co.*, 284 Ga. 286 667 S.E.2d 90 (2008), for the proposition that the Court should not "adopt an approach which considered the purpose and historical evolution of pollution exclusions before looking to the plain language of the clause itself." *Georgia Farm*, 298 Ga. at 720, 784 S.E.2d at 425. In *Reed*, the plaintiff claimed that she was poisoned by the release of carbon monoxide inside her rental home. *Reed*, 284 Ga. at 288, 667 S.E.2d at 92. The insurance policy's definition of "pollutant" in *Reed* is the same definition provided for in *Georgia*

10

*Farm*, and the same definition included in the Liberty Mutual insurance policies at issue here. The Supreme Court of Georgia read that the plain language of the "pollutant" definition was "matter, in any state, acting as an 'irritant or contaminant[.]'" *Georgia Farm*, 298 Ga. at 720, 784 S.E.2d at 425 (quoting *Reed*, 284 Ga. at 288, 667 S.E.2d at 92). Specifically, the Court noted that focusing on extrinsic sources of interpretation is what leads to the ambiguity in the pollution exclusion clause where none exists. *Georgia Farm*, 298 Ga. at 721, 784 S.E.2d at 426.

Maryland Courts similarly first apply the terms of the insurance contract itself. *Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997) (quoting *Bausch & Lomb v. Utica Mutual*, 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993). Then, "[w]e construe insurance policies as a whole to determine the parties' intentions." *Litz*, 346 Md. at 224, 695 A.2d at 569 (internal citations omitted). The *Georgia Farm* court decided not to interpret the insurance contract's terms, and rather decided *Georgia Farm* on the narrower grounds of applying the contract's plain language. *Georgia Farm*, 298 Ga. at 720, 784 S.E.2d at 425. The *Sullins* Court was not afforded that luxury, because the term "pollutant" was not defined in the parties' contract. Had the term been defined, the *Sullins* Court may not have examined the historical context and come to a different conclusion, but that is not an issue for this Court to currently decide.

The case law of Maryland and Georgia on pollution exclusion clauses is not so contrary to overcome *lex loci contractus*. *Sullins* required us to interpret the contract's language. We are not charged with such a task here. Rather, we are asked to answer the question of whether Maryland's current public policy is so contrary to Georgia's decision

11

in *Georgia Farm*, which, even in light of our discussion in *Sullins*, is no. We have consistently held "that the *lex loci contractus* principle is not inflexible" and thus, *Georgia Farm*'s holding will apply to Appellants' claims, unless the exception applies, because such a result would violate Maryland's public policy. *Hood*, 395 Md. at 620, 911 A.2d at 848. Because *Georgia Farm* did not interpret the terms that we determined had environmental implications, the two cases are not so at odds to override Georgia's law. To interpret *Sullins* to mean that Maryland's public policy strongly requires lead-based paint exclusions to be explicitly and unambiguously identified, sufficient to overcome *lex loci contractus*, would be inapposite to the express direction from the legislature and the precedent of this Court. *See* Maryland Code, § 19-704(c) of the Insurance Article (permitting insurers to include lead hazard coverage exclusions in insurance policies); *Sullins*, 340 Md. at 518, 667 A.2d at 624 (opining that "conflicting interpretations of the policy language in judicial opinions is not determinative[ ]"). For the *lex loci contractus* doctrine to be set aside, Maryland's public policy "must be very strong and not merely a situation in which Maryland law is different from the law of another jurisdiction." *Cunningham*, 441 Md. at 337–38, 107 A.3d at 1211. For reasons to be explained, Maryland's public policy is not contrary to *Georgia Farm*, thus Georgia's law applies.

### III.    **Maryland's Public Policy**

Appellants contend that Georgia's interpretation of the pollution exclusion provision should not apply because it would violate Maryland's public policy concerning the protection of victims of childhood lead-based paint poisoning. This Court has long

12

recognized that declaration of the State's public policy is the function of the legislative branch of the government. *Felder v. Butler*, 292 Md. 174, 183, 438 A.2d 494, 499 (1981); *see Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 36, 944 A.2d 1122, 1135 (2008) (commenting "[i]t is, after all, the General Assembly that sets the public policy of the State…."); *Rausch v. Allstate Ins. Co.*, 388 Md. 690, 715, n. 13, 882 A.2d 801, 816, n. 13 (2005) (explaining the General Assembly that "sets the public policy of the State, especially economic and social policy[ ]"); *Frey v. Frey*, 298 Md. 552, 562, 471 A.2d 705, 710 (1984) (internal citations omitted) (opining that the "declaration of public policy is normally the function of the legislature," and to evaluate the public policy we look to statutory provisions); *Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 460, 456 A.2d 894, 903 (1983) (recognizing that the declaration of the public policy of Maryland is normally the function of the General Assembly).

Demonstration of a strong public policy, sufficient to warrant an exception to application of another jurisdiction's law under *lex loci contractus*, is usually evidenced by explicit legislative action. *Bethlehem Steel Corp. v. G.C. Zarnas & Co.*, 304 Md. 183, 190, 498 A.2d 605, 608 (1985). Even though evidence of Maryland's public policy may be found through explicit legislative determinations, "explicit legislative language [is] not required always in order to reach a conclusion that a Maryland Code provision represents strong public policy. On occasion, we have given some weight to evolving public policy." *Cunningham*, 441 Md. at 340, 107 A.3d at 1213. We now turn to examine Maryland's lead-based paint and pollution exclusion initiatives to determine whether either of these are

13

currently evolving areas of public policy that would merit abandonment of the *lex loci contractus* choice of law doctrine in this instance.

## A. Maryland's Public Policy Approach to Lead-Based Paint Abatement

Neither this Court, nor this State, is blind to the deleterious and devastating effects of childhood lead-based paint poisoning. Appellants thoroughly discuss the historical, legislative, judicial, and scientific-related initiatives concerning the safety and protection of victims of lead-based paint poisoning. Appellants assert Maryland's response to the public health issue is evidence of "strong and steadfast" public policy. However, Appellants misunderstand that a response to a public health issue does not affirmatively answer the very narrow question posed before us: whether Georgia's application of pollution exclusion clauses clearly violates Maryland's public policy.

Historically, Maryland has developed a series of legislative policies aimed at protecting Maryland's children against the severe and permanent effects of lead-based paint poisoning by eradicating lead-based paint in homes. These legislative policies are indicative of a statewide commitment to eliminating lead-based paint from homes. These policies are not evolving toward requiring insurers to cover lead-based paint related claims. Appellants' contentions that Maryland's steadfast and continued efforts to pass laws geared towards removing lead-based paint from homes, do not necessarily translate into a demonstration of a strong state public policy of barring a pollution exclusion provision sufficient to override Georgia's law.

14

Maryland has taken a strong approach in protecting children from poisoning by lead-based paint containing substances[5] through legislation aimed at abatement[6] of lead-based paint. Childhood lead-based paint poisoning has been a public issue of national concern for the last fifty years. *See* Richard Rabin, *Warnings Unheeded: A History of Child Lead Poisoning*, 79 Am. J. Pub. Health, 1668, 1668 (Dec. 1989). Beginning in the mid-1920s, childhood lead-based paint poisoning gained broader recognition as a common childhood disease, originally believed to be a condition solely stemming from lead-painted surfaces in the home. *Id.* However, later research uncovered that major sources of lead-based paint were also in "toys, furniture, porch railings, and window sills…" of many

---

[5] A 'Lead containing substance' means:
(1) Any paint, plaster, or surface encapsulation material containing more than 0.50 percent lead by weight calculated as lead metal in the dried solid or more than 0.7 milligrams lead per square centimeter as measured by an X-ray fluorescence analyzer; or
(2) Such other standards consistent with an applicable federal definition as the Department may set by regulation.
Maryland Code, § 6-1001(c) of the Environmental Article.

[6] By statute, abatement is defined as follows:
(b) "Abatement" means a set of measures that eliminate or reduce lead-based paint hazards in residential, public, or commercial buildings, bridges, or other structures or superstructures in accordance with standards established by the Department which may include:
(1) The removal of lead-based paint and lead-contaminated dust, the containment or encapsulation of lead-based paint, the replacement or demolition of lead-painted surfaces or fixtures, and the removal or covering of lead-contaminated soil;
(2) All preparation, cleanup, disposal, and postabatement clearance testing activities associated with these measures; and
(3) The renovation, repair, and painting of a lead-containing substance in a residential, public, or commercial building built before 1978.
Maryland Code, § 6-1001(b) of the Environmental Article.

residences. *Id.* at 1669. Children, who typically exhibit hand-to-mouth activity, can ingest either lead-based paint chips that have flaked, or lead dust that becomes present due to normal wear and tear, home repair, or renovation. Jane E. Schukoske, *Lead Paint and the Warranty of Habitability in Pre-1950 Rental Housing: Maryland's Lead Poisoning Prevention Program Creates A Presumption of the Presence of Lead Paint*, 4 U. Balt. J. Envtl. L. 22, 29 (1994). Consumption of lead-based paint flakes or dust, even in small amounts, may result in poisoning. *Id.* Permanent injuries caused by lead-based paint poisoning include cognitive impairments, learning disabilities, and developmental delays. Md. Gen. Assemb. Rep. of the Lead Paint Poison. Comm'n. at 2 (May 5, 1994). Often, these permanent injuries that manifest during childhood subsequently impact a person's ability to function as an adult. *Id.*

In many ways, Maryland's approach to abating lead-based paint began in Baltimore City, which has been particularly devastated by lead-based paint poisoning. Commencing in 1935, Baltimore City embarked on a series of steps to aid in the diagnoses and prevention of childhood lead-based paint poisoning. *See* George W. Schucker, *et. al.*, *Prevention of Lead Paint Poisoning Among Baltimore Children*, 80 Pub. Health Rep. 969, 969 (Nov. 1965). At the first signs of large-scale lead-based paint poisoning in children, Baltimore began offering free access to physicians and hospitals for determination of blood lead levels in children. *Id.* By 1949, Baltimore City assigned a public health nurse to investigate lead-based paint reports. *Id.* Baltimore initiated laboratory studies, through which patients' homes were visited and paint samples were taken for testing. *Id.* Baltimore distributed

16

pamphlets and aired television and radio broadcasts, to inform the public of the dire consequences and risks of childhood ingestion of lead-based paint. *Id.*

In 1951, Baltimore became the first city in the United States to prohibit the use of lead-based paint through city regulation, which was later codified in Baltimore's City Code. *Id.;* Baltimore City Rev. Code, HEALTH, § 5-402; (City Code, 1976/83, art. 11, §72.) (Ord. 99-548.) Even with this regulation, a series of surveys initiated in 1957 to assess the prevalence of lead-based paint in Baltimore homes, revealed that between fifty-eight to seventy percent of homes contained lead-based paint. Schucker, *supra* at 970. Although Baltimore City was a pioneer in its response to the lead-based paint issue, children in Baltimore City were at very high-risk for lead poisoning compared to the nation as a whole. Joanne Pollak, *The Lead-Based Paint Abatement Repair & Maintenance Study in Baltimore: Historic Framework and Study Design*, 6 J. Health Care L. & Pol'y 89, 92 (2002).

Recognizing a public health crisis, Maryland responded with legislation to abate the frequency of poisoning in children by removing lead-based paint in homes. Although a positive development, the General Assembly did not react to the lead-based paint issue until twenty years after Baltimore City. In 1971, the General Assembly prohibited use of lead based paint statewide on "any interior surfaces; on any exterior surfaces where children may commonly be exposed; on any porch of any dwelling or….any article that is intended for household use." 1971 Md. Laws, Ch. 495; Maryland Code, § 6-301 of the Environmental Article ("EN") (1982, 2013 Repl. Vol.). The statewide prohibition of lead-

17

based paint was still in many ways a progressive step, with evidence suggesting that Maryland was one of only four states that had statutorily prohibited lead-based paint use by 1974.[7] William F. Greer, Jr, *Lead Paint Poisoning--Municipal, State, and Federal Approaches*, 7 Urb. L. Ann. 247, 256 (1974). It was not until 1978 that the United States Consumer Products Safety Commission prohibited the use of lead in house paint throughout the nation. 16 C.F.R. § 1303.1. Later codified in the United States Code, Congress found that the Federal response to the national crisis was severely limited but identified a national goal of eliminating lead-based paint hazards in housing. 42 U.S.C.A. § 4851. However, banning lead-based paint at the national, state, and local level did not by itself eliminate the root of the issue: the stock of existing housing that still contained lead-based paint. Pollak, *supra* at 91.

Maryland's public policy reflects an effort to abate lead-based paint poisoning by stopping its use in older buildings that contained lead-based paint. Maryland's statutory scheme creates incentives and compliance driven initiatives requiring homeowners, namely landlords, to remove lead-based paint from their property. Regulatory programs incentivize landlords to remove lead-based paint in residential properties, often by assessing fines or civil damages for noncompliance. Jennifer Tiller, *Easing Lead Paint Laws: A Step in the Wrong Direction*, 18 Harv. Envtl. L. Rev. 265, 268–69 (1994). Without

---

[7] Cal. Civ. Code Ann. § 1942 (West 1954); La. Civ. Code Ann. art. 2694 (West 1954); Mont. Rev. Codes Ann. § 42-202 (1947); N.D. Cent. Code § 47-16-13 (1960); Okla. Stat. Ann. tit. 41, § 32 (1954); S.D. Compiled Laws § 43-32-9 (1967). William F. Jr. Greer, *Lead Paint Poisoning--Municipal, State, and Federal Approaches*, 7 Urb. L. Ann. 247, 256 n. 52 (1974).

the threat of civil liability, it would be in the landlord's pecuniary interest to let society

bear the cost of childhood lead poisoning. *Id.* Since Maryland banned lead-based paint in

homes in 1971, the General Assembly has passed a series of laws with the purpose of

removing lead-based paint from homes, while ensuring that landlords are compliant with

state prescribed initiatives.

Maryland took another step to abate lead-based paint in homes by creating the Lead

Poisoning Prevention Program.[8] *See generally* 1994 Maryland Laws Ch. 114 (H.B. 760);

EN §§ 6-802, 6-807. The purpose of the program is "to reduce the incidence of childhood

lead poisoning, while maintaining the stock of available affordable rental housing." EN §

6-802. Through the program, landlords are required to register affected property.[9] Property

owners then must satisfy certain risk reduction standards, and pass a test for lead-

---

[8] The General Assembly of Maryland created the Accreditation of Lead Paint Abatement Services. *See generally* LEAD PAINT ABATEMENT SERVICES— ACCREDITATION, 1993 Maryland Laws Ch. 296 (H.B. 306); EN § 6-1004(b)(2). The Lead Accreditation Fund was comprised of government funds or grants to assist with the "development, establishment, administration, and education and enforcement activities of the lead paint abatement services accreditation program[.]" *Id.*

[9] Affected property, requiring registration is defined in section 6-801(b) as follows:
 (b)(1) "Affected property" means:
    (i) A property constructed before 1950 that contains at least one rental dwelling unit;
    (ii) On and after January 1, 2015, a property constructed before 1978 that contains at least one rental unit; or
    (iii) Any residential rental property for which the owner makes an election under § 6-803(a)(2) of this subtitle.
(2) "Affected property" includes an individual rental dwelling unit within a multifamily rental dwelling.
(3) "Affected property" does not include property exempted under § 6-803(b) of this subtitle. *Id.* § 6-801.

contaminated dust provided that flaking paint has been removed or repainted on the exterior and interior surfaces. *Id.* § 6-815. The property owner has to satisfy the statutorily prescribed standards and pass the lead-contaminated dust test before each occupancy turnover. *Id.* By statute, a State inspector must verify the property owner's compliance with the statute. *Id.* The Lead Poisoning Prevention Commission was tasked with measuring the law's ability to protect children from lead poisoning and lessen risks to responsible owners. *Id.* § 6-810. *See generally* Schukoske*, supra* (discussing statutory nuances of the Lead Poisoning Prevention Program).

The General Assembly further elucidated through § 19-704 of the Insurance Article that that excluding lead-based paint as a pollutant does not run contrary to this State's public policy.[10] 1996 Maryland Laws Ch. 11 (H.B. 11); Maryland Code, § 19-704 of the Insurance Article ("IN"). Section § 19-704(c) provides that "whenever an authorized insurer issues or renews a policy for an affected property, the authorized insurer may include in the policy a lead hazard coverage exclusion." IN § 19-704(c). The statute's

---

[10] In 1994, as part of the Lead Poisoning Prevention Program, the General Assembly adopted §§ 734 through 737, Article 48A, of the Insurance Code. As originally enacted, Md. Code Art. 48A, § 735(a) provided: "[n]otwithstanding subsection (f) of this section, upon the inception or renewal of a policy, an insurer may provide for a lead hazard exclusion with respect to a policy of insurance covering an affected property." Md. Code 1957, Art. 48A, § 735(a). Section 19-704 was created through the Maryland 1996 Session Laws following a recodification of the Insurance Article, but subsection (c) traces the language in article 48A, § 735(a). *See* 1996 Maryland Laws Ch. 11 (H.B. 11) (explaining "[t]his section is new language derived without substantive change from former Art. 48A, §§ 734(e)(2) and 735(a) through (f)[ ]).

application to "affected properties,"[11] similarly to the language in EN § 6-801 defined *supra* note 9, primarily focuses on stock housing built prior to 1978 that may contain lead-based paint. The General Assembly expressly indicated that insurers can exclude lead-based paint related claims from insurance policies. Thus, the General Assembly had the opportunity and means to consider lead-based paint related insurance issues. It then follows that if the General Assembly considered the maximum of explicitly permitting insurers to exclude coverage of lead-based paint claims, it cannot be contrary to the State's public policy to exclude lead-based paint claims pursuant to a pollution exclusion clause.

IN § 19-704(c) does not reference a duty for insurers to indemnify and defend lead-based paint claims through a pollution exclusion clause. It does not reference pollutants at all. Rather, it plainly states that insurers have the option to exclude coverage for lead-based paint related claims. We should not read an interpretation into a statute that is unambiguous. It is well established that "we neither add nor delete words to a clear and

---

[11] Affected property, requiring registration is defined in section § 19-701 (b)(1) as follows:
(b)(1)"Affected property" means:
    (i) 1. a residential rental property constructed before 1950 that contains not more than one rental dwelling unit; or
    2. a residential rental property that contains not more than one rental dwelling unit for which the owner makes an election under § 6-803(a)(2) of the Environment Article; or
    (ii) an individual rental dwelling unit within:
    1. a residential rental property constructed before 1950 that contains more than one rental dwelling unit; or
    2. a residential rental property that contains more than one rental dwelling unit for which the owner makes an election under § 6-803(a)(2) of the Environment Article.
(2) "Affected property" does not include property exempted under § 6-803(b) of the Environment Article. IN § 19-701(b).

21

unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Bellard v. State*, 452 Md. 467, 481 (2017). If the statute is unambiguous, our legislative inquiry ends. *Id.* The statute unambiguously demonstrates that removing lead-based paint claims from insurance policies is permissible. Further, the General Assembly's explicit dictation of the State's public policy in IN § 19-704, a year after this Court held that an insurer had a duty to defend a lead-based paint related injury in *Sullins*, illustrates that the General Assembly is responsible for establishing public policy. *Sullins*, 340 Md. at 518, 667 A.2d at 624. The statute's application to "affected property," *i.e.* older homes that may contain lead-based paint, confirms our conclusion that the General Assembly's legislative goals are lead-based paint abatement and holding landlords accountable to their tenants.

Laws passed after the Lead Poisoning Prevention Program began, and the General Assembly specifically expressed that insurers could exclude lead-based paint related claims, also worked toward stopping lead-based paint at its source and assisting landlords in removing lead-based paint. Maryland created financial protection for tenants when a landlord fails to make the premises safe and free of lead-based paint as required by the Lead Poisoning Prevention Program. 1997 Maryland Laws Ch. 714 (H.B. 1068); Maryland Code, § 8-211.1 of the Real Property Article ("RP") provides that "if a landlord fails to comply with the applicable risk reduction standard under § 6-815 or § 6-819 of the Environment Article, the tenant may deposit the tenant's rent in an escrow account…." RP

22

§ 8-211.1(a). Maryland also initiated the Lead Hazard Reduction Grant and Loan Programs. 2005 Maryland Laws Ch. 26 (H.B. 11); Maryland Code, §§ 4-708, 4-709 of the House and Community Development Article ("HS"). The purpose of these programs was to "make grants and loans to owners of residential property or child care centers for financing lead hazard reduction activities[.]" HS § 4-703. In conjunction with implementing these programs, the General Assembly found that "lead poisoning harms the health and well-being of children and pregnant women and causes substantial long-term public costs for medical expenses and additional education[.]" HS § 4-702(3).

Maryland's public policy on lead-based paint poisoning was designed to protect victims of lead-based paint by working to thwart its existence in stock housing. The General Assembly evidenced this policy through direct legislation banning lead-based paint in homes, allowing insurers to remove coverage for lead-based paint related claims, requiring homeowners to register properties that could be affected by lead-based paint, protecting tenants' financial interests who may be living in homes with lead-based paint, funding loan and grant programs to remove lead-based paint from homes, and establishing healthcare funds for victims of lead-based paint poisoning. Appellants are correct that the overarching public policy in Maryland affords protection for victims of childhood lead-based paint poisoning. However, Maryland's public policy approach focused on eradicating the source of lead-based paint and aiding victims' health care needs, if impacted. Georgia's decision holding that lead-based paint is a pollutant, is not at odds with Maryland's public policy where our General Assembly has not directly indicated

23

otherwise, and the clear trend of Maryland's public policy is to remove lead-based paint in homes and provide health care for victims. *Georgia Farm*, 298 Ga. at 721, 784 S.E.2d at 426.

### B. Maryland's Public Policy on Contract Exclusion Provisions

Application of Georgia law under the *lex loci contractus* doctrine further does not clearly offend Maryland's public policy because the General Assembly has not expressly dictated that lead-based paint cannot be excluded from insurance policies as pollutants, and because pollution exclusion clauses are not an evolving area of public policy. In fact, the General Assembly has explicitly expressed that insurers "may include in the policy a lead hazard coverage exclusion." IN § 19-704(c). Although Maryland has taken strong initiatives requiring landlords to abate lead-based paint in housing, in those instances where we have applied the *lex loci contractus* public policy exception, the legislature has explicitly stated that the action was void or contrary to public policy. *See, e.g. Bethlehem Steel,* 304 Md. at 190, 498 A.2d at 608 (deciding against application of *lex loci contractus* for a construction contract executed in Pennsylvania as void against Maryland public policy when the relevant statute "unequivocally told the Maryland judiciary that such a clause 'is void and unenforceable' ... [and] in the same sentence of the statute, the General Assembly expressly stated that such an indemnity provision 'is against public policy[ ]'"). *See also Nat'l Glass, Inc. v. J.C. Penney Properties, Inc.*, 336 Md. 606, 614, 650 A.2d 246, 250 (1994) (holding that a Pennsylvania choice of law provision was void where a mechanic's lien statute contained a clause stating that contractual provisions made in

24

violation of the statute were "void as against public policy of this State.") (citing Maryland Code (1974, 1988 Repl. Vol.), RP §§ 9–101 *et seq.*).

As Appellees have highlighted, Appellants have not identified any Maryland legislative action addressing lead-based paint as a pollutant in insurance policies. It appears, no such legislation exists. A review of both Maryland's legislative lead-based paint and insurance exclusion initiatives does not reflect a current or evolving public policy strong enough to overcome Georgia's pollution exclusion law. Without a statement from the General Assembly to the contrary, we cannot conclude that Georgia's interpretation of the pollution exclusion clause is clearly against Maryland's public policy.

Despite Appellants' contention, *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, is not persuasive. 390 Md. 449, 889 A.2d 387 (2006). Appellants rely on *Clendenin* to argue that the pollution exclusion in the Liberty Mutual insurance policies is invalid. In *Clendenin,* we examined a pollution exclusion provision in the United States Fire Insurance Company's policy and found the provision to be ambiguous. *Id.* Following the Maryland rules of construction, we concluded that the provision did not exclude coverage for bodily injury resulting from workplace welding fumes. *Id*. at 468, 889 A.2d at 399. We determined that "products, despite their toxic nature, are not 'pollutants' or 'contaminants' when used intentionally and legally." *Id.* at 463, 889 A.2d at 396 (emphasis omitted). *Clendenin* is not relevant to the certified question before this Court, where the issue is not of intent or legality, but rather, whether Georgia's interpretation of the pollution exclusion clause violates Maryland's public policy.

**CONCLUSION**

We conclude that the application of Georgia's interpretation of the pollution exclusion contained in the Liberty Mutual insurance policies does not violate Maryland's public policy. Absent a legislative affirmation that pollution exclusion clauses are against public policy, we decline to declare that Georgia's law violates Maryland's public policy. Therefore, Georgia's interpretation of the pollution exclusion clause governs here.

**THE CERTIFIED QUESTION ANSWERED AS SET FORTH ABOVE. PURSUANT TO SECTION 12-610 OF THE COURTS AND JUDICIAL PROCEEDINGS ARTICLE, THE COSTS SHALL BE EQUALLY DIVIDED BETWEEN THE PARTIES.**

United States District Court for the District of Maryland
Case No. 1:16-cv-03177-JFM

Argued: September 12, 2017

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 1

September Term, 2017

_____

QUANTA BROWNLEE, ET AL.

v.

LIBERTY MUTUAL FIRE INSURANCE
COMPANY, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: December 18, 2017

Respectfully, I dissent. The United States District Court for the District of Maryland certified to this Court the following question of law: "Would application of Georgia's interpretation of the pollution exclusion contained in the insurance policy issued by Liberty Mutual Insurance Company [("Liberty Mutual")] to the Salvation Army as excluding coverage for bodily injuries resulting from the ingestion of lead-based paint violate Maryland public policy?" Unlike the Majority, I would answer the certified question of law with a resounding "yes," and hold that it is a violation of Maryland public policy to apply Georgia case law that permits a pollutant exclusion in an insurance policy to be interpreted as a lead-based paint exclusion because Maryland has a strong public policy of protecting children from injuries caused by lead-based paint and of requiring exclusions for lead-based paint to unambiguously and specifically indicate that the exclusion applies to lead-based paint to be valid.

Under the choice of law principle of *lex loci contractus*, "when determining the construction, validity, enforceability, or interpretation of a contract, we apply the law of the jurisdiction where the contract was made." Cunningham v. Feinberg, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015) (citations omitted). Nevertheless, the principle of *lex loci contractus* "is not inflexible and [] it does not apply to a contract provision which is against Maryland public policy." Lab. Corp. of Am. v. Hood, 395 Md. 608, 620, 911 A.2d 841, 848 (2006) (citation and internal quotation marks omitted). This Court has stated, however, "that merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy and that for another [S]tate's law to be unenforceable, there must be a strong public policy against its enforcement in

Maryland." Id. at 620, 911 A.2d at 848 (citation and internal quotation marks omitted).

The key issue in this case—indeed, the very issue posed in the certified question of law—is whether Maryland has a strong public policy of protecting children from lead-based paint poisoning and in requiring that lead-based paint exclusions be specifically identified in insurance policies such that application of Georgia's case law is unenforceable and would offend the principle of *lex loci contractus*. On this key issue, I depart from the view of the Majority, as I would conclude that there is a strong public policy expressed by the General Assembly in Maryland that renders the application of <u>Ga. Farm Bureau Mut. Ins. Co. v. Smith</u>, 784 S.E.2d 422, 423 (Ga. 2016) unenforceable.

Establishing clear public policy, Md. Code Ann., Ins. (1995-97, 2011 Repl. Vol.) ("IN") § 19-704, derived from former Md. Code, Art. 48A, §§ 734 and 735, concerning lead hazard coverage for rental property, provides, in pertinent part, as follows:

> (c) *Exclusion of coverage*. — Notwithstanding subsection (g) of this section, whenever an authorized insurer issues or renews a policy for an affected property, the authorized insurer may include in the policy a lead hazard coverage exclusion.

An "affected property," in turn, is defined in IN § 19-701(b) as follows:

> (1) "Affected property" means:
>
> > (i)     1. a residential property constructed before 1950 that contains not more than one rental dwelling unit; or
> >
> > 2. a residential rental property that contains not more than one rental dwelling unit for which the owner makes an election under § 6-803(a)(2) of the Environment Article;[1] or

---

[1]Md. Code Ann., Envir. (1982, 1987, 2013 Repl. Vol.) ("EN") § 6-803(a)(2) provides that Subtitle 8, concerning reduction of lead risk in housing, applies to,

(ii) an individual rental dwelling unit within:

1. a residential rental property constructed before 1950 that contains more than one rental dwelling unit; or

2. a residential rental property that contains more than one rental dwelling unit for which the owner makes an election under § 6-803(a)(2) of the Environment Article.

(2) "Affected property" does not include property exempted under § 6-803(b) of the Environment Article.[2]

IN § 19-704(c) does not provide that insurance policies containing pollutant exclusions are the equivalent of insurance policies containing lead hazard coverage exclusions. Stated otherwise, as IN § 19-704(c) demonstrates, a lead hazard coverage exclusion is different from a pollutant exclusion. Indeed, IN § 19-704(c) specifically provides that, with respect to certain properties—affected properties as that term is defined in IN § 19-701(b)— insurers may include within an insurance policy a lead hazard coverage exclusion. In other words, IN § 19-704(c) is a very specific statute that provides

---

"[n]othwithstanding subsection (b) of this section, any residential rental property, the owner of which elects to comply with this subtitle."

[2]EN § 6-803(b) provides that Subtitle 8, concerning reduction of lead risk in housing, does not apply to:

(1) Property not expressly covered in subsection (a) of this section;

(2) Affected property owned or operated by a unit of federal, State, or local government, or any public, quasi-public, or municipal corporation, if the affected property is subject to lead standards that are equal to, or more stringent than, the risk reduction standard established under § 6-815 of this subtitle; or

(3) Affected property which is certified to be lead-free pursuant to § 6-804 of this subtitle.

for a lead hazard coverage exclusion under detailed identified circumstances; this statute does not authorize a pollutant exclusion to operate as the equivalent of a lead hazard coverage exclusion.

Indeed, the majority opinion explicitly recognizes that IN § 19-704 does not apply to pollutant exclusions in insurance policies. Without qualification, the Majority writes: "IN § 19-704(c) does not reference a duty for insurers to indemnify and defend lead-based paint claims through a pollution exclusion clause. It does not reference pollutants at all. Rather, it plainly states that insurers have the option to exclude coverage for lead-based paint related claims." Maj. Slip Op. at 21. With this admission, the majority opinion concedes that IN § 19-704 offers no support for the proposition that it provides guidance with respect to public policy in Maryland concerning allowing pollutant exclusions in insurance policies to act as lead hazard coverage exclusions. Nonetheless, the majority opinion concludes that "Georgia's decision holding that lead-based paint is a pollutant, is not at odds with Maryland's public policy where our General Assembly has not directly indicated otherwise[.]" Maj. Slip Op. at 23-24. The majority opinion apparently reasons that there is a lack of strong public policy against pollutant exclusions being treated as lead hazard coverage exclusions because the General Assembly has not expressly addressed the issue of pollutant exclusions covering lead-based paint. The majority opinion, however, ignores the strong public policy implications of IN § 19-704(c)'s unambiguous permission of lead hazard coverage exclusions only, *i.e.*, lead-based paint exclusions must be clear and unequivocal.

Significantly, in <u>Sullins v. Allstate Ins. Co.</u>, 340 Md. 503, 506, 509, 516, 518, 667

A.2d 617, 618, 620, 623, 624 (1995), in response to a certified question of law from the United States District Court for the District of Maryland, in a thorough and well-reasoned opinion, this Court determined that the terms "contaminants" and "pollutants" in a pollutant exclusion of an insurance policy were ambiguous and susceptible to different meanings, including meanings not encompassing lead-based paint, and that, in accordance with Maryland law, the insurance policy at issue could not be construed to include lead-based paint as a contaminant or pollutant, and instead was to be construed against the insurer as the drafter of the policy, such that the insurer was not relieved of its duty to defend in the underlying lead-based paint poisoning lawsuit. In Sullins, id. at 506-07, 667 A.2d at 618, the pollutant exclusion at issue, contained in a section labeled "Losses We Do Not Cover," provided:

> We do not cover bodily injury or property damage which results in any manner from the discharge, dispersal, release, or escape of:
>
> a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gasses;
>
> b) waste materials or other irritants, contaminants or pollutants.

In construing the terms "contaminants" and "pollutants," and determining whether lead-based paint was a contaminant or pollutant, this Court observed that the terms were "susceptible of two interpretations by a reasonably prudent layperson. By one interpretation, these terms encompass lead paint; by another interpretation, they apply only to cases of environmental pollution or contamination, and not to products such as lead paint." Id. at 509, 667 A.2d at 620. This Court explained that, "[w]hile lead is clearly 'toxic,' a reasonably prudent layperson may not view lead as a 'chemical[,]'" and that

- 5 -

"[s]imilarly, a reasonably prudent layperson may not generally think of lead as an 'irritant.'" Id. at 510, 667 A.2d at 620. This Court acknowledged, however, that a reasonably prudent layperson could consider lead to be a "contaminant" or a "pollutant" under the ordinary dictionary definitions of those terms. See id. at 511, 667 A.2d at 620. On the other hand, this Court noted that "[a] reasonably prudent layperson may also interpret the terms 'contaminant' and 'pollutant' as *not* including lead paint." Id. at 511, 667 A.2d at 620 (emphasis in original). This Court further observed that courts in other jurisdictions had found the term "pollutant" both ambiguous and unambiguous with respect to lead-based paint. See id. at 511, 667 A.2d at 620-21.

This Court also examined the history of the pollutant exclusion, and determined that the history supported the conclusion that a reasonably prudent layperson may not consider lead-based paint to be either a pollutant or a contaminant. See id. at 513, 667 A.2d at 621-22. The original pollutant exclusions were drafted by insurers in response to environmental catastrophes that occurred in the 1960s to clarify that commercial general liability insurance policies did not indemnify knowing polluters. See id. at 514, 667 A.2d at 622. That "sudden and accidental" pollutant exclusion, which specifically referenced "into or upon land, the atmosphere or any watercourse or body of water[,]" "was intended to eliminate coverage for damages from pollution of the environment." Id. at 514, 667 A.2d at 622 (citations omitted). Thereafter, in 1985, the insurance industry adopted the "'absolute pollution exclusion[,]' which denied coverage for 'bodily injury or property damage arising out of the actual, alleged or threatened discharge, release, or escape of pollutants' and defined 'pollutant' as 'any solid, liquid, gaseous or thermal irritant or

- 6 -

contaminant including smoke, vapor, soot, fumes, acids, alkalies, chemicals and waste.'" Id. at 514-15, 667 A.2d at 622. In adopting the "absolute pollution exclusion," and using environmental terms of art such as "discharge, dispersal, release, or escape," insurers deleted as redundant reference to "into or upon land, the atmosphere or any watercourse or body of water." Id. at 515, 667 A.2d at 622. This Court explained that there was "no indication that the change in the language was meant to expand the scope of the clause to non-environmental damage." Id. at 515, 667 A.2d at 622 (citation and internal quotation marks omitted). Indeed, this Court concluded that the use of environmental law terms of art such as "discharge," "dispersal," "release," "escape," "contaminant," and "pollutant" in the absolute pollution exclusion demonstrated that the insurance "industry's intention was to exclude only environmental pollution damage from coverage[.]" Id. at 515, 667 A.2d at 622-23.

Accordingly, in Sullins, this Court determined that the history of the pollutant exclusion supported "our conclusion that a reasonably prudent layperson may interpret the terms 'pollution' and 'contamination,' in the circumstances of the case now before us, as *not* encompassing lead paint, a product used legally and intentionally." Id. at 516, 667 A.2d at 623 (emphasis in original). And, because the terms "pollution" and "contamination" were ambiguous, this Court held that they had to be construed against the insurer as the drafter of the insurance policy. See id. at 516, 667 A.2d at 623.

What can be gleaned from Sullins is that, where an insurance policy contains a pollutant exclusion with ambiguous terms—terms that could be interpreted to have multiple meanings when viewed by a reasonably prudent layperson—such terms must be

construed against the drafter of the policy, *i.e.*, the insurer. Moreover, as explained in Sullins, tracing the history of the pollutant exclusion demonstrates that pollutant exclusions originated as a means of excluding coverage for damage caused by environmental pollution, not for damage caused by non-environmental pollution of the type that could result from the legal use of products in residences. Additionally, notably, Sullins supports the conclusion that exclusions from coverage for injuries caused by lead-based paint must unambiguously include lead-based paint as a pollutant to be valid.

This is not the status of Georgia case law. In 2016, in Ga. Farm, 784 S.E.2d at 423, the Supreme Court of Georgia concluded that lead-based paint was a "pollutant" as defined by the applicable insurance policy such that the "pollution exclusion" in the insurance policy applied to exclude coverage of personal injury claims arising from lead-based paint poisoning. This is the case that the Majority finds to be controlling. In Ga. Farm, id., Amy Smith ("Smith"), in her individual capacity and on behalf of her daughter Tyasia Brown ("Brown"), sued her landlord, Bobby Chupp ("Chupp"), for injuries that Brown allegedly sustained from lead-based paint poisoning that occurred in the house that Smith rented from Chupp. During the relevant time, Chupp's house was insured under a commercial general liability insurance policy issued by Georgia Farm Bureau Mutual Insurance Company ("Georgia Farm"), which contained a "pollution exclusion" that provided as follows:

This insurance does not apply to:

. . .

(f) Pollution

- 8 -

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants": (a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.

Id. (ellipsis in original). The insurance policy defined the term "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Id.

In the trial court, Georgia Farm argued, in pertinent part, that the pollutant exclusion applied to Brown's alleged injuries from lead poisoning, *i.e.*, that the claims were excluded from coverage, and that, accordingly, it was relieved of its contractual duty to defend and indemnify Chupp in the lawsuit. See id. The trial court agreed and granted summary judgment in Georgia Farm's favor, finding "that lead-based paint unambiguously fell within the policy's definition of a 'pollutant,' and, as a result, Brown's alleged injuries were excluded from coverage pursuant to the pollution exclusion clause." Id. In so ruling, the trial court relied on Reed v. Auto-Owners Ins. Co., 667 S.E.2d 90, 92 (Ga. 2008), in which the Supreme Court of Georgia interpreted an identical pollutant exclusion contained in a commercial general liability insurance policy insuring residential rental property and held that, although not expressly identified in the insurance policy as a pollutant, carbon monoxide gas was a pollutant and, therefore, the plaintiff's injuries arising from carbon monoxide poisoning were excluded from coverage under the pollutant exclusion. See Ga. Farm, 784 S.E.2d at 423-24.

Notably, in Ga. Farm, id. at 424, on appeal to the Court of Appeals of Georgia, that

Court reversed the trial court's judgment in favor of Georgia Farm, observing that there existed a conflict in other jurisdictions as to whether lead-based paint should be considered a pollutant for purposes of a pollutant exclusion in an insurance policy. In light of Georgia law requiring the narrow construction of exclusions from coverage in insurance policies, the Court of Appeals of Georgia was persuaded to follow the example of jurisdictions that had held that a pollutant exclusion did not bar coverage for injuries arising from lead-based paint poisoning. See id. Significantly, the Court of Appeals of Georgia relied on this Court's opinion in Sullins, 340 Md. at 509-10, 667 A.2d at 620, and concluded that, "with respect to allegations of bodily injury arising from exposure to lead-based paint, the terms 'contaminants' and 'pollutants' used in a [commercial general liability] policy's pollution exclusion were ambiguous and should be strictly construed against the insurer[.]" Ga. Farm, 784 S.E.2d at 424 (citation omitted). The Court of Appeals of Georgia determined that Georgia Farm had failed to demonstrate that lead-based paint was a "pollutant" as defined by the insurance policy. See id. The Court of Appeals of Georgia distinguished Reed, the case relied on by the trial court, "finding that, while a straightforward reading of the pollution exclusion in *Reed* compelled the conclusion that carbon monoxide gas was a pollutant, it was unclear whether identical language in the instant policy was expansive enough to unambiguously include lead, lead-based paint or paint as a pollutant." Ga. Farm, 784 S.E.2d at 424 (citation omitted). Thereafter, Georgia Farm filed a petition for a writ of *certiorari*, which the Supreme Court of Georgia granted. See id.

Ultimately, the Supreme Court of Georgia reversed the judgment of the Court of Appeals of Georgia, and relied on Georgia precedent in which Georgia courts had

interpreted pollutant exclusions to apply to all injuries caused by pollutants, even those caused by something other than traditional environmental pollution, and that the term "pollutant" applies to any contaminant and the contaminant need not be expressly identified in the insurance policy for a pollutant exclusion to be valid. See id. at 425. After discussing applicable Georgia case law, the Supreme Court of Georgia concluded that, "[u]nder the broad definition contained in Chupp's policy, . . . lead present in paint unambiguously qualifies as a pollutant and [] the plain language of the policy's pollution exclusion clause thus excludes Smith's claims against Chupp from coverage." Id. at 426 (footnote omitted). This outcome would not have been the same had the circumstances of the case been analyzed under the principles set forth by this Court in Sullins.

The majority opinion attempts to distinguish this Court's holding in Sullins by inaccurately claiming that the policy at issue in Georgia Farms was different because the policy contained a definition of the term pollutant and, in Georgia Farms, "[t]he Supreme Court of Georgia read that the plain language of the pollutant definition was matter, in any state, acting as an irritant or contaminant[,]" whereas in the pollution exclusion at issue in Sullins, the term pollutant was not defined. Maj. Slip Op. at 11 (citation and internal quotation marks omitted). The definition of the term pollutant in the pollution exclusion at issue in Georgia Farms, 784 S.E.2d at 423, was in actuality as set forth above—"any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste"—and the definition did not unambiguously define pollutant to include lead-based paint. Rather than relying on the plain language of the exclusion, in reversing the intermediate appellate court, the Supreme Court of Georgia

utilized Georgia case law in which Georgia courts had earlier determined that the term "pollutant" applies to any contaminant, and the contaminant need not be expressly identified in the insurance policy for a pollutant exclusion to be valid. See id. at 425. Thus, in Georgia Farms, the term pollutant was not defined in a manner that merely allowed a plain language determination that the term included lead-based paint, and such is not the circumstance in this case either.

To be sure, public policy in Maryland permits an insurance policy to contain an exclusion for coverage for injuries caused by lead-based paint. IN § 19-704(c) speaks for itself, authorizing insurers to include lead hazard coverage exclusions under certain narrow circumstances. Nevertheless, the Liberty Mutual insurance policy at issue in this case does not contain a lead hazard coverage exclusion; it contains a pollutant exclusion. Indeed, the Majority specifically acknowledges that, "[n]otably, the policies do not include lead-based paint exclusion provisions, but the policies do include pollution exclusion provisions." Maj. Slip Op. at 3.

After conceding that the Liberty Mutual exclusion is a pollution exclusion and not a lead hazard coverage exclusion, the majority opinion concludes that "the General Assembly's explicit dictation of the State's public policy in IN § 19-704, a year after this Court held that that an insurer had a duty to defend a lead-based paint related injury in *Sullins*, illustrates that the General Assembly is responsible for establishing public policy." Maj. Slip. Op. at 22 (citing Sullins, 340 Md. at 518, 667 A.2d at 624). The majority opinion overlooks the legislative history of IN § 19-704. What is now IN § 19-704(c) was originally enacted by the General Assembly in 1994 as part of the Lead Poisoning

- 12 -

Prevention Program Act.  See 1994 Md. Laws 1282, 1343 (Ch. 114, H.B. 760).  The Lead

Poisoning Prevention Program Act took effect on October 1, 1994, and the session law

provided "[t]hat, notwithstanding other provisions of this Act, this Act shall apply

beginning on January 1, 1995 to insurance policies issued or renewed between October 1,

1994 and December 31, 1994."  Id. at 1347.

As originally enacted, Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, §

735(a)—the section that is now IN § 19-704(c)—provided:

> (a) *Provision*. — Notwithstanding subsection (f) of this section, upon the
> inception or renewal of a policy, an insurer may provide for a lead hazard
> exclusion with respect to a policy of insurance covering an affected property.

In 1996, as part of adding certain titles to the Insurance Article, Md. Code (1994 Repl.

Vol., 1995 Supp.), Art. 48A, § 735(a) was recodified without substantive change as IN §

19-704(c).  See 1996 Md. Laws 235, 236, 524-28 (Ch. 11, H.B. 11).  That recodification

took effect on October 1, 1997.  See 1996 Md. Laws 693 (Ch. 11, H.B. 11).  As recodified,

IN § 19-704(c) provided, and continues to provide, as follows:

> (c) *Exclusion of coverage*. — Notwithstanding subsection (g) of this section,
> whenever an authorized insurer issues or renews a policy for an affected
> property, the authorized insurer may include in the policy a lead hazard
> coverage exclusion.

The history of IN § 19-704 demonstrates that the lead hazard coverage exclusion in

Maryland preceded the Court's decision in Sullins.  It is inaccurate to link the enactment

of  IN § 19-704 to Sullins in anyway.  This Court issued Sullins on November 6, 1995,

after Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) was enacted and became

effective.  However, Sullins involved an insurance policy that was issued on September

14, 1990; *i.e.*, Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) would not have applied to the policy at issue in that case. And, in <u>Sullins</u>, this Court did not discuss or mention Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a) or the Lead Poisoning Prevention Program Act.

Moreover, Md. Code (1994 Repl. Vol, 1995 Supp.), Art. 48A, § 735(a) was recodified in 1996 as IN § 19-704(c) without substantive change. As stated, <u>Sullins</u> was decided in 1995. In recodifying Md. Code (1994 Repl. Vol, 1995 Supp.), Art. 48A, § 735(a) in 1996, the General Assembly would have been aware of this Court's decision in <u>Sullins</u>, and could have made changes to the lead hazard coverage exclusion to enlarge it to encompass pollutant exclusions generally, but the General Assembly did not do this. It is clear that the strong public policy in Maryland is that a lead-based paint exclusion must be unambiguous. Undoubtedly, one of the purposes of IN § 19-704(c) and its predecessor is plainly to prevent insureds from signing insurance policies and being unaware that coverage for injuries caused by lead-based paint is excluded.

Ultimately, in Maryland, there is a strong public policy of protecting children from injuries caused by lead-based paint and of requiring that lead-based paint exclusions in insurance policies be clear and unambiguous. This is evident from statutes enacted by the General Assembly. For example, in Md. Code Ann., Hous. & Cmty. Dev. (2005-06) § 4-702, part of the subtitle governing the lead hazard reduction grant program and lead hazard reduction loan program, the General Assembly specifically made the following findings:

The General Assembly finds that:

    (1) lead paint is present in a large percentage of residential properties

- 14 -

in the State, particularly residential rental properties constructed before 1950;

  (2) lead paint on the friction surfaces of windows is a leading cause of lead poisoning;

  (3) lead poisoning harms the health and well-being of children and pregnant women and causes substantial long-term public costs for medical expenses and additional education; and

  (4) reduction or elimination of lead in the environment will reduce:

    (i) the risk of lead poisoning of children and pregnant women;

    (ii) the incidence of learning disabilities and behavioral problems in children who live in older housing; and

    (iii) the cost of publicly financed medical care.

I would conclude that there is an equally strong public policy in Maryland, as demonstrated by Md. Code (1994 Repl. Vol., 1995 Supp.), Art. 48A, § 735(a), and its recodification without substantive change to IN § 19-704(c) after this Court's decision in Sullins, that for an insurance policy exclusion from coverage of injuries caused by lead-based paint to be valid, the exclusion must be explicit and unambiguous. Stated otherwise, in my view, IN § 19-704(c), its predecessor, and the existence of this Court's decision in Sullins inescapably lead to the conclusion that a lead-based paint exclusion in an insurance policy must be expressly and unambiguously identified, either through a lead hazard coverage exclusion of the type authorized by IN § 19-704(c) or through some other exclusion, which expressly includes lead-based paint for purposes of the exclusion. Respectfully, the Majority's conclusion that, under Georgia case law, an insurance contract with a pollution exclusion is enforceable as a lead-based paint exclusion and that this does not violate Maryland's public policy is in direct contradiction with this Court's holding in Sullins, in

which this Court answered the same certified question to the contrary.

I would determine that the pollutant exclusion in the Liberty Mutual insurance policy runs afoul of a strong Maryland public policy on its face by failing to specifically and unambiguously include lead-based paint as a "pollutant" covered in the pollutant exclusion. The definition of "pollutant" contained in the Liberty Mutual insurance policy—"any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste"—is ambiguous and a reasonably prudent layperson both may and may not believe lead-based paint to be a "pollutant" based on the plain language of the pollutant exclusion contained in the Liberty Mutual insurance policy. And, notably, the Liberty Mutual pollutant exclusion contains environmental law terms of art such as "discharge," "dispersal," "seepage," "migration, "release", and "escape," which, as this Court explained in Sullins, 340 Md. at 515-16, 667 A.2d at 622-23, supports the conclusion that the insurance industry intended pollutant exclusions to apply only to environmental pollution damage, and not necessarily to the lawful use of products in the home, and that a reasonably prudent layperson could "interpret the term[] 'pollution' . . . as *not* encompassing lead paint, a product used legally and intentionally." (Emphasis in original). I would conclude that the public policy exception to the principle of *lex loci contractus* is applicable, and I would answer the certified question of law "yes," and hold that it would violate Maryland public policy to apply Georgia case law, specifically, the Ga. Farm case, under the circumstances of this case because Maryland has both a strong public policy of protecting children from injuries caused by lead-based paint and of requiring exclusions for lead-based paint to be unambiguous to be valid.

For the above reasons, respectfully, I dissent.